[No. 30969. Department Two. August 25, 1949.]

AL FLEISCHMAN et al., *Appellants*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES *and* MARION KELLOGG, *Respondents*.[1]

[1]Reported in 209 P. (2d) 363.

632

SIMPSON, C. J., dissents.

*O'Leary, Meyer & O'Leary*, for appellants.

*The Attorney General* and *Theodore M. Ryan, Assistant*, for respondents.

SCHWELLENBACH, J.—This is an appeal by an employer from a judgment of the superior court for Thurston county, dismissing an appeal from a decision of the department of labor and industries, and affirming the decision of the department. The claimant, Marion Kellogg, filed the report of the accident; thereafter, on August 21, 1947, the department notified the employer that the claimant had been allowed one hundred fifty dollars for time loss from May 15, 1947, to August 15, 1947; the employer appealed to the joint board, which conducted hearings (at which a number of witnesses testified) commencing December 23, 1947, and continuing at various times, through July 13, 1948.

At the time of the hearing, Marion Kellogg was forty-nine years old. He started his employment at the Bucoda mill in December, 1946, working the night shift as an operator of a Ross carrier. This is a machine which straddles piles of lumber set on bunks about four inches from the floor; picks them up and transports them to different locations in the mill. The driver sits on top of the carrier between seven and eight feet from the ground. In order to get in place to drive, it is necessary to climb up the framework. Mr. Kellogg operated two of these carriers and had to go up and down from one to the other from twenty-five to forty times an hour.

Prior to March, 1947, he never experienced any difficulty because of his work. He testified that he never "dreamed" he had heart trouble. In the latter part of March he had a bad pain under his shoulder blade, but thought it was a displaced vertebra. On April 1st he went to Dr. George M. Lovelace, his family physician, and complained of pain on excitement or exertion. The doctor examined his heart, but could find nothing wrong, although his pulse was somewhat abnormal. He gave Kellogg a stomach potion and a nerve sedative.

Kellogg came back April 29th complaining of substernal pains, which took his breath. The doctor told him that it was his heart and prescribed some nitroglycerine and aminophylline to relieve spasms of the coronary artery. He instructed him to rest until the following Friday and to "take it easy."

About a week before May 14th, Kellogg was involved in a crisis at the mill when Jim Canfield, a friend and fellow employee, caught his arm in a steel roller. The men, including Kellogg, worked desperately to dismantle the roller but found that the process required special tools. In order to secure the tools, it was necessary to locate the millwright, which involved considerable running around. Despite the feverish efforts of his fellow workmen, it took over half an hour to extricate Canfield's arm. That it was a period of great excitement and strain for all concerned is evidenced by the fact that the mill immediately closed down for the rest of the shift. The excitement and added exertion which this emergency necessitated, apparently proved too much for Kellogg. In the course of assisting his friend, he suddenly became breathless and felt as if he were "going to pass out," so that he had to go outside and lie down on a pile of lumber. He worked a few days after that, but from then on, did not feel very good.

In the afternoon of May 14th, he went to the hospital to see Canfield. While he was there, Dr. Lovelace, who was Canfield's physician also, came in. The doctor testified at the hearing that at that time Kellogg looked ill; that he was

apparently in pain; and that he, the doctor, became alarmed about him. Accordingly, after taking his pulse and finding it "weak and thready," he advised Kellogg not to work that night but to go to bed immediately, either at the hospital or at home. Kellogg made arrangements for someone to work in his place, returned home, and went to bed. That night at about three o'clock, he had a severe attack. His wife called the doctor, and Kellogg was rushed to the hospital. There is no question but that at that time he suffered a coronary thrombosis.

The joint board sustained the action of the supervisor in allowing the claim, and found the date of the injury to be on or about May 8, 1947.

Appellants state the question: "Does the record in this case justify a finding that the workman here was injured in the course of his employment within the meaning of the Workmen's Compensation Act of the State of Washington?"

█ In all court proceedings under the workmen's compensation act, the decision of the department shall be *prima facie* correct and the burden of proof is on the party attacking the same. Rem. Supp. 1943, § 7697 [P.P.C. § 704-1].

█ Rem. Rev. Stat. (Sup.), § 7675 [P.P.C. § 709-1], defines "injury" as follows:

"The word 'injury' as used in this act means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom."

That definition has been interpreted by this court in *McCormick Lbr. Co. v. Department of Labor & Industries*, 7 Wn. (2d) 40, 108 P. (2d) 807:

"An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, *whatever the degree of exertion or the condition of the workman's health.*

"To say now that some unusual effort or strain is necessary to render death compensable, would not only be in direct conflict with the plain and emphatic language of our holdings, but would also introduce an element of uncertainty and confusion, in that every case would present a problem as to the standard to be used in determining

whether or not, in a given instance, the exertion was unusual, and whether or not the workman was expending only the ordinary exertion required in a particular line of employment. The rule above stated has been accepted in this state after much discussion and diversity of opinion. It is now firmly established, and we see no reason for departing from it."

Four doctors testified concerning the claimant's physical condition. Two of them, Dr. K. L. Partlow and Dr. Van M. Sim, neither of whom examined the claimant, testified, in answer to hypothetical questions, that in their opinion, there was no direct relationship between his occupation and his coronary attack. Dr. John F. Steele, of Tacoma, a specialist in heart ailments, examined Kellogg July 17, 1947, which was subsequent to the attack. Based upon that examination, plus the history received from the claimant, and an examination of X rays and an electrocardiogram, he concluded that a coronary occlusion had been brought on by his work. Because Dr. Lovelace had been his family physician for some few years, had examined and treated him from time to time, and had treated him at the time of the attack, and because the department evidently relied on his testimony, we deem it advisable to quote from portions of his testimony. Dr. Lovelace is not a specialist in matters of heart disease. He is more of a general practitioner. He testified:

"What is your opinion, Doctor, with reference to whether or not the condition of his work as you were aware of it was or was not responsible for his condition? A. Yes, I think it's responsible. Don't misunderstand me. Now, there is, there is a — he might have had a condition that was receptive to this injury, but I think his condition occurred on the job. I think it was aggravated by his work. I think it was definitely an industrial injury."

After a Ross carrier had been described to him he was asked:

".  .  . did that, in your opinion, Doctor, tend to cause or aggravate his condition to bring about the condition that he had when you saw him? A. Yes, sir: Yes, sir; definitely."

Under cross-examination he testified:

"Q. Now, a blood clot of that type, that would shut off the supply of blood, resulting in an attack of the kind this man had, would that be a clot that would form in a short period of time or over a long period of time? A. Well, usually a coronary thrombosis is a progressive thing, unless it's fatal right away. Q. Are you able to determine, Doctor, from the type of attack that this man had, about how long that condition had been progressing in his particular case? A. Well, yes. I'd say less than 24-36 hours. Q. Less than 24 or 36 hours? A. Yes, I'd certainly say that. Q. In other words, if I gather your testimony correctly, when you examined this man on April 29, of 1947, you would not be able then, at that time, to say that you could determine that he was going to have a coronary attack? A. You couldn't determine he was going to have one, no. He —when you say coronary attack — Q. Of the type that you described. A. Yes, yes . . . Wouldn't it be true, Doctor, that a man in his condition, as he was at that time, his condition would be aggravated if he were to go up and down stairs, would it not? A. Yes, I think a little bit. Q. Or if he were to cut the lawn around his house? A. Yes, I think that would probably aggravate it. Q. In other words, any physical exertion? A. (Indicates yes.) Q. For a man in that condition would be bad? A. That is right. Q. Would you be able to say, Doctor, if you knew what the man had been doing for the past month, say? Would you be able to point to any particular physical exertion that he had had during that time and say that is the cause of this man's condition? A. Well, the thing that impressed me in this particular case was the fact that he had his coronary thrombosis at the time this man—about the same time this man was hurt up there and about the same time his complaints were the worse, and because of that fact and because of the fact that he was on the job, I think that that precipitated this man's condition. Q. In other words, it's your opinion, is it not, the fact that this man was hurt in his presence or at least a man who was working with him that had been hurt, that fact caused sufficient mental turmoil to result in his attack? A. Not only mental, but physical. This man was in the roller up there for 30 or 45 minutes, as I understand, and then the next day this man showed that he was pretty bad. . . . Q. A person that has a heart receptive to coronary thrombosis, then, Doctor, has a heart that over a considerable period of time has developed that receptiveness? A. Yes, I think that is true.

Q. And about how long a time would you say? A. Well, I don't know. I'd say at least probably from May, '47, April, '47. Q. In other words, if I understand you correctly, you can develop a heart that is receptive to coronary thrombosis in approximately a month? A. Yes, I think so."

In *Sumerlin v. Department of Labor & Industries*, 8 Wn. (2d) 43, 111 P. (2d) 603, we said:

"We are also satisfied that it is not now necessary to show that death of one engaged in extrahazardous employment was caused or contributed to by an unusual exertion or strain, . . ."

The attack may occur subsequent to the injury, provided it is a direct and proximate result thereof. *Northwest Metal Products v. Department of Labor & Industries*, 12 Wn. (2d) 155, 120 P. (2d) 855.

We are satisfied that there was sufficient probative evidence to warrant the findings by the joint board that the claimant suffered a heart attack on May 8th while assisting in extricating his friend's arm from the roller; that this occurred in the course of his employment and was an injury within the meaning of the workmen's compensation act; and that the claimant's coronary thrombosis on May 15th was the result of that injury. We do not feel that such findings are foreclosed by the testimony of Dr. Lovelace to the effect that the attack which claimant suffered had been progressing less than twenty-four to thirty-six hours. As we understand the doctor's testimony, the blood clot which partially shut off the supply of blood, thereby causing the attack, had progressed for between twenty-four and thirty-six hours. It was precipitated during that period, but it was the direct result of the overexertion and excitement which he sustained on the night of May 8th.

The judgment is affirmed.

ROBINSON, JEFFERS, and GRADY, JJ., concur.

SIMPSON, C. J., dissents.