[No. 33918.    *En Banc.*    March 20, 1958.]

ALMA M. WINDUST, *Appellant,* v. THE DEPARTMENT OF LABOR
AND INDUSTRIES *et al., Respondents.*[1]

[1]Reported in 323 P. (2d) 241.

*Chester A. Lesh* and *E. L. Casey,* for appellant.

*The Attorney General, John C. Martin, Assistant,* and *Seth W. Morrison* (of *Allen, DeGarmo & Leedy*), for respondents.

MALLERY, J.—Aubra H. Windust died on March 29, 1954, at the age of sixty-one years, while working for the Glacier Sand and Gravel Company as an operator of a ready-mix concrete truck.

On April 28, 1954, his widow filed a claim for a pension with the department of labor and industries, which the supervisor rejected upon the ground that there was no injury within the contemplation of the workmen's compensation act. The board of industrial insurance appeals sustained the supervisor's order, and claimant appealed to the superior court. From its judgment of dismissal, she appeals to this court.

As a driver of the ready-mix concrete truck, one of the workman's customary duties was to walk out on the catwalk on the side of the truck, step up about two feet and look into the drum to see how much concrete was in it. He fell dead, on the day in question, just as he was stepping up to look into the drum. Appellant contends this act incident to his employment constituted an *injury* under the workmen's compensation act. It is not denied that the workman had been looking into the drum to ascertain the amount of re-

maining concrete, whenever his duties required it, for approximately ten years.

The workman's death was due to a myocardial infarction involving the interventricular septum caused by fatty deposits on the inside of the heart arteries, known as arteriosclerosis, which so narrowed them that not enough blood could pass through to supply the heart muscle. Dr. Sloan's testimony followed the customary pattern that, if the workman had not engaged in his work but had been receiving proper medical treatment at the time he looked into the drum, he would not have died.

This satisfied the rule of *McCormick Lbr. Co. v. Department of Labor & Industries,* 7 Wn. (2d) 40, 108 P. (2d) 807, which is:

"An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, *whatever the degree of exertion or the condition of the workman's health.*"

This formula justifies holding that the recurring duties of a job and acts incident thereto constitute *injuries,* whenever a workman's heart ailment has progressed to the point where a restriction of activities is essential to his survival.

The rule of the *McCormick* case has represented for many years the decisional weight of authority in this state. If the doctrine of *stare decisis* is applicable to cases which interpret a statute, we are not now free to depart from that rule, notwithstanding its obvious conflict with the statute.

The statute in question is RCW 51.08.100 [*cf.* Rem. Rev. Stat. (Sup.), § 7675; Rem. Supp. 1941, § 7679-1]. It provides:

" 'Injury' means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without; an occupational disease; and such physical condition as results from either."

▮ This situation, in which the statute is amended or repealed by a court-made rule, warrants an examination of the doctrine of *stare decisis* and the proper occasion for its application. This is its definition in Webster's New International Dictionary (2d ed.):

"Literally, to stand by decided. matters; . . . as implying the doctrine or policy of following rules or principles laid down in previous judicial decisions unless they contravene the ordinary principles of justice. This principle had an important part in the development of the English common law."

Indeed, the common law is comprised of that body of court decisions in the nonstatutory field to which the doctrine of *stare decisis* applies. The rule of law of those cases was promulgated by the courts for the inescapable reason that pending litigation had to be disposed of, even though there was no legislative enactment that governed the issue therein. Uniform and equal justice naturally required subsequent adherence to such decisions in the absence of pertinent legislation. In the sense that the promulgation of a rule of law is legislation, the courts can and do properly legislate in nonstatutory fields. Every case governed by *stare decisis,* rather than statute law, is a proper occasion for judicial legislation. However, the courts may only so legislate in fields left vacant by the legislature. A legislative enactment, intended to be comprehensive upon a subject, pre-empts that field, with the result that the court's constitutional function with regard to it is thereafter limited to an interpretation of what the legislature meant by the language used in the statute.

The application of the doctrine of *stare decisis* is, of course, not the same thing as the interpretation of a statute. The distinction was made clear in *Petersen v. Department of Labor & Industries,* 40 Wn. (2d) 635, 245 P. (2d) 1161, wherein we said:

"Cases involving statutory interpretation require that we restrict ourselves to a determination of the meaning of the statutory language in question. In this they differ from cases concerned with rules of the common law wherein wisdom and practicality, in the light of human experience, inhere in the judicial process.

"Statutory cases have a fixed base from which we always start. Thus, they are unlike common-law cases wherein the later cases supersede the earlier ones to the extent of any differences between them."

The cumulative effect of many slight deviations is demonstrated by the rule of *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29, which, in 1925, held that a vendee under an executory contract to purchase real property, acquired no title or interest, legal or equitable, in it. It has never been overruled, yet, in a series of subsequent cases, it has been whittled away until nothing remains. 32 Wash. L. Rev. 130. Each case revamped the law a little in order to do justice on its particular facts. It is the cumulative effect of these little deviations that produced the final result.

The application of the doctrine of *stare decisis* to the interpretation of a statute will, more often than not, lead to the eventual repeal or amendment of the statute, just as it has in the instant case.

When Chief Justice Hughes said the law is what the supreme court says it is, he meant, with regard to statute law, that the function of *interpreting* a statute belongs to the supreme court. Interpretation of the meaning of a statute ends where the amendment or repeal of it begins.

■ The court repeal of a statute by the application of the doctrine of *stare decisis,* makes it pertinent to look at the *function* of the court. Under our constitution, there is a limit to the application of the doctrine of *stare decisis.* That limitation inheres in our checks and balance form of constitutional democracy, which vests the legislative power in the legislature and the people, subject only to certain constitutional prohibitions and limitations.

■ Of course, it is the duty of the court to invalidate a statute if it contravenes the constitution. Such a holding has as its purpose the implementation of the supremacy of the constitution. For the court to repeal a statute for no other reason than that it conflicts with the doctrine of *stare decisis,* is an obvious encroachment upon the legislative branch of the government. Unfortunately, the checks and balance system of our constitution is implemented, as to the manner in which the courts shall function, only by our discriminative self-restraint. Its exercise alone will avoid arbitrary judicial invasion of the other departments of government.

The gravity of substantial judicial encroachment upon the legislature, under the guise of following the doctrine of *stare decisis,* warrants a reference to the admonition in *Petersen v. Department of Labor & Industries, supra,* that "Statutory cases have a fixed base from which we always start." It may be added that only the *statute* contains the authoritative language in which the law is couched. A constant paraphrasing of the statutes by the court, such as is done in the *McCormick* case, initiates the process exemplified in *Ashford v. Reese, supra,* by which an accumulation of small changes overrules the law. By that process, more and more weight is inevitably given to opinions and less and less to the statute until, as in the *McCormick* case, the law is all opinion and no statute.

■ Since the doctrine of *stare decisis* is not applicable to a case of statutory interpretation, we advert directly to the language of the statute to ascertain if there has been an *injury* in the instant case.

" 'Injury' means a *sudden and tangible happening,* of a traumatic nature, producing an immediate or prompt result, and occurring from without; . . ." (Italics ours.) RCW 51.08.100, *supra.*

■ We are constrained to hold that the routine act of ten years' standing is not an injury as a matter of law. Interpreting this particular and exact language of the statute in *Mork v. Department of Labor & Industries,* 48 Wn. (2d) 74, 291 P. (2d) 650, we said:

"The act of the deceased in returning to his station is not an industrial accident. As we said in *Higgins v. Department of Labor & Industries,* 27 Wn. (2d) 816, 180 P. (2d) 559:

" 'There is no sudden and tangible happening in the present case, no matter of notoriety, nor an event which can be fixed in time, but rather an incapacity due to the relatively slow and insidious inroads of a progressive and apparently incurable disease.' "

In *Haerling. v. Department of Labor & Industries,* 49 Wn. (2d) 403, 301 P. (2d) 1078, we also interpreted a "sudden and tangible happening," as used in the statutory

definition of an injury. In that case, the workman was a deputy sheriff who died of a coronary occlusion while at home in bed. His claim was predicated upon the fact that "From May 4, 1953, until early June, 1953, he was doing the work of three men, and working thirteen to eighteen hours a day." He was denied recovery on the ground that

" . . . there is no sudden and tangible happening, of a traumatic nature, upon which the workman relies as the cause of his *injury*. . . .

"The cumulative effect of long continued routine and customary duties upon a workman, regardless of the hours devoted thereto, is not a sudden and tangible happening. The statute contemplates a *happening*, of a traumatic nature, producing an immediate and prompt result, in order for the *injury* resulting therefrom to be compensable under the act. A cumulative effect, however injurious, is noncompensable unless it constitutes an industrial disease, not here in issue."

These interpretations of *injury* accord well with the statute, and, indeed, no other interpretation is possible, without doing violence to the English language.

Let it be understood that we now follow the language of the statute, which is the only authoritative statement of the law, and we do not reach the instant result by following the *Mork* and *Haerling* cases *as stare decisis*. They are consulted only because of the proper judicial objective in maintaining the symmetry of the law. The furtherance of this objective, and the recurring citation of the *McCormick* case in the briefs of claimant appellants generally, convince us of the need to overrule it, which we specifically do.

All of the heart cases which follow the *McCormick* rule are hereby overruled. They include, among others, the cases of *Sumerlin v. Department of Labor & Industries*, 8 Wn. (2d) 43, 111 P. (2d) 603; *Cooper v. Department of Labor & Industries*, 11 Wn. (2d) 248, 118 P. (2d) 942; *Northwest Metal Products, Inc. v. Department of Labor & Industries*, 12 Wn. (2d) 155, 120 P. (2d) 855; *Guy F. Atkinson Co. v. Webber*, 15 Wn. (2d) 579, 131 P. (2d) 421; *Olympia Brewing Co. v. Department of Labor & Industries*,

34 Wn. (2d) 498, 208 P. (2d) 1181; *Fleischman v. Department of Labor & Industries*, 34 Wn. (2d) 631, 209 P. (2d) 363; *Merritt v. Department of Labor & Industries*, 41 Wn. (2d) 633, 251 P. (2d) 158.

The judgment is affirmed.

HILL, C. J., DONWORTH, WEAVER, and OTT, JJ., concur.

DONWORTH, J. (concurring)—I concur in the majority opinion but wish to state my views on *stare decisis* in addition to what is said on the subject therein.

The original workmen's compensation act, adopted in 1911, defined "injury" as follows:

"The words injury or injured, as used in this act, refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease." Laws of 1911, chapter 74, § 3, p. 349.

In *Frandila v. Department of Labor & Industries*, 137 Wash. 530, 243 Pac. 5 (1926), this court had occasion to construe the above quoted statute. There the workman, while engaged in digging a ditch and chopping a root at the bottom of the ditch, suddenly collapsed and died. The testimony established that the workman was suffering from hardening of the arteries, and that he died from either a rupture of a blood vessel or from embolism. This court, in allowing recovery to the widow, held that the hardened arteries, coupled with overexercise in the course of the employment, caused either the hemorrhage or embolism, and that the chopping of the root was a definite and particular occurrence, which was a contributing, proximate cause of the death. The court then said:

"An accident exists when a man undertaking work is unable to withstand the exertion required to do it, whatever may be the degree of exertion used or the condition of the workman's health."

In the next session of the legislature, in 1927, the definition of the word "injury" (which definition still exists at the present time) was materially changed to read as follows:

"The word 'injury' as used in this act means a sudden

and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditioin as results therefrom." Laws of 1927, chapter 310, § 2, p. 818; re-enacted by Laws of 1939, chapter 41, § 2, p. 125 [*cf.* RCW 51.08.100].

In *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821 (1932), the workman was working rapidly sawing a tree that had fallen across the road in order to get the road reopened for travel with the least possible delay. The task required more than ordinary exertion. When the log was almost sawed through, the workman fell over and died of a cerebral hemorrhage.

The appellant (department of labor and industries) strenuously contended that such a strain was not an injury under the 1927 definition of injury quoted above.

This court quoted, with approval, from *Pellerin v. Washington Veneer Co.,* 163 Wash. 555, 2 P. (2d) 658 (1931), as follows:

"The manifest intention of the legislature in the enactment of the new definition of injury was to make more certain the definition of injury and make it apply strictly to *sudden and tangible happenings occurring from without of a traumatic nature* producing an immediate or prompt result." (Italics ours.)

In upholding the claim for compensation, the court quoted expert testimony that the workman's death, in the opinion of the doctor, was caused by the overexertion required by the task of quickly removing the log from the road. It then said:

"The fact that his arteries had so hardened that death was likely to result 'from a sudden and tangible happening of a traumatic nature,' does not deprive Mr. Metcalf's widow and minor child of their right to statutory benefits. It was not the legislature's purpose to limit the provisions of the workmen's compensation act to only such persons as approximate physical perfection."

The cases interpreting the 1927 definition of injury are extensively reviewed in *McCormick Lbr. Co. v. Department of Labor & Industries,* 7 Wn. (2d) 40, 108 P. (2d) 807

(1941), which was heard *En Banc*, two judges dissenting. In that case, the workman (a logger) collapsed and died while sawing a tree. A post-mortem examination of the body revealed that the deceased had been suffering from chronic conditions of endocarditis, myocarditis, and gastritis. There was expert testimony that the exertion required in sawing the tree was a contributing factor in his death. This court held that the death was the result of an injury, stating that:

"An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, *whatever the degree of exertion or the condition of the workman's health.*"

However, Judge Simpson, in his dissenting opinion (in which Judge Robinson concurred), pointed out that the judicial interpretation of the 1927 definition of injury went far beyond the ordinary meaning of the words used by the legislature, saying:

"The mere fact that the man happened to be engaged in performing the functions of his employment at the moment his progressive disease reached its climax, at which point any exertion, any movement, any effort would cause the diseased heart to cease its function, should not be considered as creating a situation in which compensation becomes proper. In such a case, industry is not the *cause* of the injury, but simply provides the setting for it. To impose upon industry the risk created by progressive diseases, such as heart trouble, apoplexy, embolism, and the like, reaching their climaxes at a time *while the workmen are engaged in performing their everyday functions*, is to greatly out-distance the legislature's intention, and throws a far greater burden on industry than the act itself was intended to impose, *if its language is to be regarded as expressive of its intent.* In effect . . . the interpretation of the majority serves to make of our act an insurance system, rather than a compensation system, and to do so certainly violates the purpose of those who passed the act.

"*It may be that every workman injured or suffering in any manner while he is working should receive compensation or insurance therefor. However, such matters are within the province of the legislative body.*" (Italics ours.)

The following cases have adhered to the rule set out in the *McCormick* case: *Sumerlin v. Department of Labor & Industries*, 8 Wn. (2d) 43, 111 P. (2d) 603 (1941); *Cooper v. Department of Labor & Industries*, 11 Wn. (2d) 248, 118 P. (2d) 942 (1941); *Northwest Metal Products, Inc. v. Department of Labor & Industries*, 12 Wn. (2d) 155, 120 P. (2d) 855 (1942); *Guiles v. Department of Labor & Industries*, 13 Wn. (2d) 605, 126 P. (2d) 195 (1942); *Guy F. Atkinson Co. v. Webber*, 15 Wn. (2d) 579, 131 P. (2d) 421, 137 P. (2d) 814 (1942); *Long-Bell Lbr. Co. v. Parry*, 22 Wn. (2d) 309, 156 P. (2d) 225 (1945); *Olympia Brewing Co. v. Department of Labor & Industries*, 34 Wn. (2d) 498, 208 P. (2d) 1181 (1949); *Fleischman v. Department of Labor & Industries*, 34 Wn. (2d) 631, 209 P. (2d) 363 (1949); and *Merritt v. Department of Labor & Industries*, 41 Wn. (2d) 633, 251 P. (2d) 158 (1952).

In some of our later cases, which are best exemplified by *Mork v. Department of Labor & Industries*, 48 Wn. (2d) 74, 291 P. (2d) 650 (1955), we have refused to follow the *McCormick* rule.

In *Mork v. Department of Labor & Industries, supra,* we said:

"Even in heart cases, compensability is not predicated upon principles of ordinary life insurance. Death, which is the last stage of a progressive disease, is not within the scope of the industrial insurance act. To be within the act, an *industrial injury* must have a causal relation to the death of the workman, who otherwise would have lived for an indefinite and unpredictable time. *Mere acceleration of the final stage of a disease is not proof of the required causal relationship.*" (Last italics mine.)

In *Higgins v. Department of Labor & Industries*, 27 Wn. (2d) 816, 180 P. (2d) 559 (1947), Higgins sought compensation from the department, basing his claim on expert testimony that the work he performed aggravated and contributed to his ailment of chronic pulmonary emphysema (the ballooning or distention of the air cells and loss of elasticity of the lung tissue). In denying the plaintiff's claim, we said:

"There is no sudden and tangible happening in the pres-

ent case, no matter of notoriety, nor an event which can be fixed in time, but rather an incapacity due to the relatively slow and insidious inroads of a progressive and apparently incurable disease. It is testified that its progress was accelerated by the character of the work which appellant did for DuPont at Hanford, but that falls far short of establishing an injury within the statutory definition with which we are here concerned."

In *Peterson v. Department of Labor & Industries*, 40 Wn. (2d) 635, 245 P. (2d) 1161 (1952), the workman assisted two other employees in rolling a fifty-gallon barrel, weighing about four hundred pounds, up a wooden ramp thirty-one feet long at about ten o'clock a. m. That afternoon, he made complaints of pains in his stomach, and about five minutes later died from a coronary thrombosis. In denying the claim for a widow's pension, we said:

"We have never held that the dependent of one who dies of heart trouble is entitled to compensation because the onset of an attack occurred while engaged in extrahazardous employment. We have never dispensed with a minimum showing that the employment or an incident occurring during employment must have been, more likely than not, a contributing factor to the death, without which the death would not have occurred when it did."

In *Haerling v. Department of Labor & Industries*, 49 Wn. (2d) 403, 301 P. (2d) 1078 (1956), the plaintiff suffered a coronary occlusion. There was expert testimony that the strain and physical exertion that plaintiff was undergoing as a deputy sheriff was a direct predisposing cause of this coronary occlusion. We denied his claim for compensation, stating that:

"The cumulative effect of long continued routine and customary duties upon a workman, regardless of the hours devoted thereto, is not a sudden and tangible happening. The statute contemplates a *happening*, of a traumatic nature, producing an immediate and prompt result, in order for the *injury* resulting therefrom to be compensable under the act. A cumulative effect, however injurious, is noncompensable unless it constitutes an industrial disease, not here in issue."

Thus we have two irreconcilable lines of decisions of this court in which we have reached inconsistent conclusions as

to the application of RCW 51.08.100 (enacted in·1927 and re-enacted in 1939) to persons suffering heart attacks while in the performance of extrahazardous work.

I am of the opinion that the decision of Department One in *Metcalf v. Department of Labor & Industries, supra* (the first such case arising under the workmen's compensation act to reach this court after the legislature changed the definition of the word "injury" in 1927), was wrong in failing to give effect to the fundamental change in the statute.

Later, this error was perpetuated by the court, sitting *En Banc*, in *McCormick Lbr. Co. v. Department of Labor & Industries, supra*. In *Higgins v. Department of Labor & Industries, supra,* and *Petersen v. Department of Labor & Industries, supra,* the court showed a tendency to recede from the *McCormick* rule. In *Mork v. Department of Labor & Industries, supra,* and *Haerling v. Department of Labor & Industries, supra,* we refused to follow the *McCormick* rule.

It is not a function of this court to determine the breadth and scope of the coverage afforded by the workmen's compensation act. That is solely a function of the legislature. In 1927, the legislature narrowed that coverage because of our decision in the *Frandila* case, *supra*. We failed to give effect to the legislative change in policy when the matter was strenuously argued by the attorney general in the *Metcalf* case.

In my opinion, the doctrine of *stare decisis* does not require us to perpetuate the error of the *Metcalf* and *McCormick* cases. As we said in *In re Yand's Estate,* 23 Wn. (2d) 831, 162 P. (2d) 434, quoting with approval from a decision of the New York court of appeals:

" 'But the doctrine of *stare decisis*, like almost every other legal rule, is not without its exceptions. It does not apply to a case where it can be shown that the·law has been misunderstood or misapplied, or where the former determination is evidently contrary to reason. The authorities are abundant to show that in such cases it is the duty of courts to re-examine the question. Chancellor Kent, commenting upon the rule of *stare decisis*, said that more than a thousand cases could then be pointed out, in the· English and

American reports, which had been overruled, doubted or limited in their application. He added that "it is probable that the records of many of the courts of this country are replete with hasty and crude decisions; and in such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error." ' *Rumsey v. New York & N. E. R. Co.*, 133 N. Y. 79, 30 N. E. 654, 28 Am. St. 600."

See, also, *Hutton v. Martin*, 41 Wn. (2d) 780, 252 P. (2d) 581.

It is argued that the legislature, in re-enacting portions of the industrial insurance act in 1939, including the definition of injury originally enacted in 1927, must be deemed to have thereby adopted this court's interpretation of that definition, as stated in *Metcalf v. Department of Labor & Industries, supra,* and subsequent cases. The answer to this contention is that, if the legislature desired to change the basic plan from a workmen's compensation act to a health and accident plan effective during working hours, it should not do so obliquely or indirectly, but should be required to *expressly* declare its intention to do so.

Such a change in policy is too catastrophic to be inferred from the legislature's failure to correct the effect of our erroneous decision in the *Metcalf* case, which should be expressly overruled.

I think that, in determining whether or not there has been an injury compensable under the workmen's compensation act, we are limited by the statutory definition of the word injury. In my opinion, the legislature, in enacting the 1927 amendment, only intended to provide compensation for accidental injuries occurring in extrahazardous employment, and not to compensate workmen or their families for every heart attack which might come on during working hours.

I have signed the majority opinion affirming the judgment of the trial court.

OTT, J., concurs with DONWORTH, J.

FOSTER, J. (dissenting)—The court's decision announced today should have been made twenty-five years ago when

*Metcalf v. Department of Labor & Industries*, 168 Wash. 305, 11 P. (2d) 821, was filed. It would have been as right then as it is wrong now. The ancient aphorism, "Better late than never," is not always true, and if there be justification for the comment by the cynical wag that "Consistency is the hobgoblin of little minds," certainly this court is not so contaminated.

While the employer's exemption from the common-law liability for personal injuries is the *quid pro quo* for premium liability,[2] nevertheless, the right to the compensation is not limited to those circumstances in which there was previous tort liability; but, on the contrary, the declared legislative purpose was to afford compensation for all fortuitous results, excluding only the contraction of a disease.[3] Instead of leaving the entire loss to rest upon the injured workman or his family, where it previously fell by chance, the basic theory of all industrial insurance and workman's compensation acts is that the cost of accidents is a part of the cost of production, and should be socialized and paid by the ultimate consumer in the price of the finished product. No difference exists between industrial insurance premiums, the payroll, repair cost, plant costs, depreciation, or any other item of cost;[4] or as this court said forty-one years ago,[5] a workman is the soldier of

---

[2]*Mountain Tbr. Co. v. Washington*, 243 U. S. 219, 61 L. Ed. 685, 37 S. Ct. 260.

[3]Occupational diseases are not here considered.

[4]Col. Ethelbert Stewart, Bureau of Labor Statistics, Bulletin 596, p. 271.

". . . from requiring them to contribute reasonable amounts and according to a reasonable and definite scale by way of compensation for the loss of earning power arising from accidental injuries to their employees, irrespective of the question of negligence, instead of leaving the entire loss to rest where it may chance to fall, that is, upon particular injured employees and their dependents.

". . . The act in effect puts these hazardous occupations in the category of dangerous agencies, and requires that the losses shall be reckoned as a part of the cost of the industry, just like the pay-roll, the repair account, or any other item of cost. . . ." *Mountain Tbr. Co. v. Washington*, 243 U. S. 219, 61 L. Ed. 685, 37 S. Ct. 260.

[5]*Stertz v. Industrial Ins. Comm.*, 91 Wash. 588, 158 Pac. 256.

organized industry accepting a kind of pension in exchange for absolute insurance on his master's premises.

It was in 1914, three years after the enactment of the industrial insurance act, that the court was first called upon to interpret the word "injury."[6] The court leaned heavily upon the English decisions in reaching the conclusion that injury included everything except the contraction of disease. The workman in *Zappala v. Industrial Ins. Comm.*, 82 Wash. 314, 144 Pac. 54, sustained a hernia while pushing a handtruck. Although the truck stuck and some extraordinary effort was called for, such was not a decisive factor. The industrial insurance commission contended no accident occurred because he did not slip or fall and nothing struck him, and that he was performing only his ordinary work.

The court, in the process of inclusion and exclusion, said that, in construing the act, compensation was provided for every injury regardless of fault, and that the legislature enjoined upon the courts a liberal interpretation and declared in no uncertain terms if the truck gave way while being used, the cost would be the employer's, but it could not accept the contention of the industrial insurance commission that if the man pushing the truck breaks, there is no injury within the meaning of the industrial insurance act. The conclusion was reached that any unexpected happening disabling a workman was compensable.

When a discharged employee in revenge shot and killed the foreman who had discharged him, the industrial insurance commission rejected the claim of a widow on the ground that an accident, to be compensable, must arise out of the employment; and to solve that problem, in *Stertz v. Industrial Ins. Comm.*, 91 Wash. 588, 158 Pac. 256, the court found it necessary to explore the entire social and legal philosophy upon which the industrial insurance act was founded.

---

[6]The original definition of "injury" was: "The words injury or injured, as used in this act, refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease." Laws of 1911, chapter 74, § 3, p. 346.

The court commented on the fact both employers and employees had suffered under the common-law system from heavy judgments "of which half was opposing lawyers' booty"; that both wanted peace; and that the employer was willing to pay on many claims where in the past there had been no liability at all; and, on the other hand, workmen relinquished their right to compensatory damages in order to get a small sum in all cases without litigation. All agreed, said the court, the blood of the workman was part of the cost of production which should be borne by industry, and workmen craved the then new system because of a horror of lawyers and judicial trials and wanted compensation not only safe but sure. The court said "fortuitous event" was the strongest term that could be found and was employed by lawyers for positive strength, "a term in truth that is selected when one wishes all of 'accident' and more" and summed the whole matter in the never-to-be-forgotten sentence:

"Under our statute the workman is the soldier of organized industry accepting a kind of pension in exchange for absolute insurance on his master's premises."

*Shadbolt v. Department of Labor & Industries*, 121 Wash. 409, 209 Pac. 683, is next in point of time (1922). Shadbolt, in the regular routine of moving shingle blocks, rested them on the right side of his abdomen in the region of his appendix. He felt pain in the abdomen, nausea and vomiting ensued, causing his removal to the hospital, where later the same evening, he was operated for a ruptured appendix. The department's contention was that a particular occurrence identifiable in point of time to which an injury can be attributed, was the basic test for determining whether an injury had occurred or not, and further, this was negatived by the continued routine pressure.[7]

---

[7] "This shows that before an event is an injury as defined by our workmen's compensation act, there must be some particular time to which the injury can be attributed before the workman is entitled to compensation or else he would be unable to determine whether or not his claim was filed within one year from the injury and thus render invalid that portion of section 6604-12, quoted *supra*. If the appendix was ruptured by the constant pressure against respondent's abdomen caused

Upon facts thus briefly summarized, the court held even though the appendix was diseased, and in the ordinary course of events would have ruptured without any external pressure, a compensable accident had occurred because the continued pressure accelerated the rupture.

The three opinions just reviewed clearly indicate the court of that day was of the view the English decisions reflected the correct philosophy that any unforeseen disability resulting from exertion, of whatever degree, which caused disability or death, was compensable, regardless of the state of health of the employee involved.

Such was the state of the law, both statutory and decisional, when the first heart case reached this court in February, 1926, fifteen years after the enactment of the industrial insurance act.

The workman in *Frandila v. Department of Labor & Industries*, 137 Wash. 530, 243 Pac. 5, collapsed while chopping a root at the bottom of a ditch in which he was working, and died from heart disease within fifteen minutes after being removed from the ditch. The defense contended there was no injury because there was no unusual strain or exertion, but that his death was occasioned by slow, progressive disease or hardening of the arteries. Many decisions were reviewed, but the court relied principally on *Clover, Clayton & Co. v. Hughes*, (1910) App. Cases (L. R.) 242, in which the workman burst an aneurism of the aorta while he was tightening a nut with a wrench. There was no strain or exertion out of the ordinary. The aneurism was sufficiently developed so it might have burst during sleeping hours. The court said if the degree of exertion is too great for the man undertaking it to withstand and death occurs, it is compensable.[8]

---

by his work in transferring blocks from the carrier to the saw, it would be an occupational disease and not be a fortuitous event, and the rule is well established that an occupational disease is not an injury or an accident, and not under the workmen's compensation act." Attorney General's brief, *Shadbolt v. Department of Labor and Industries*, 17.

[8]"Where a workman, not in perfect health, during the course of his employment makes an extra exertion which, in addition to his infirmity, causes an injury, such injury is a fortuitous event, and brings him within the operation of the compensation."

Eleven months later, when the legislature convened, the statute defining "injury" was amended to read:

"The word 'injury' as used in this act means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom." Laws of 1927, chapter 310, § 2, p. 818.

Five years elapsed, however, before the court was required to decide whether the amended definition of "injury" changed the rule of law announced in the *Frandila* and preceding cases, that an accident occurs whenever a man undertaking work is unable to withstand the exertion required to do it whatever may be the degree of exertion used, or the condition of the man's health.

The writer of this dissent was assistant attorney general and counsel for the appellant department of labor and industries in the *Metcalf* case, which was appealed upon the single proposition that the 1927 amended definition of "injury" changed the law and abrogated the rule announced in *Frandila v. Department of Labor & Industries, supra.* The issue was expressly limited by the following passage from the attorney general's brief:

"The amended definition of 'injury' manifests an apparent attempt on the part of the legislature to get away from the results of the previous decisions of this court; that intention should be recognized. . . .

" . . . In the final analysis, the single question here presented is: Has the legislature changed the rule as announced in the *Frandilla* case? If it has not, this case should be affirmed; if it has, the trial court should be reversed. . . ."

The limited issue was restated in the reply brief as follows:

"No specific reply will be undertaken to either the respondent's brief or the brief of *amicus curiae,* for the question here presented may not be decided by a consideration of the quoted cases from other jurisdictions, for they reflect only the same theory as that announced by this court in the *Frandilla* case, whereas the question here presented is, did the legislature by the amended definition of the word

'injury' change that rule. If it has not, the decision of the learned trial judge is correct. If, on the other hand, the legislature has, because of the economic forces set in motion by those decisions, changed the rule, then the judgment appealed from is erroneous."

Without quibble, equivocation, or evasion, the attorney general point-blank submitted to this court that by the new definition of "injury," the legislature intended to change the rule announced in the *Frandila* and *Shadbolt* cases.

Metcalf died not from a heart attack, but from a cerebral hemorrhage. The court said if Metcalf's exertion in sawing the log resulted in a sprained wrist, a torn tendon, or a dislocated shoulder, it would have been an injury within the statutory definition of that term. The conclusion was that, because his arteries were hardened and in that condition he was unable to withstand the increased strain, his death was the result of the injury within the statutory definition, and concluded in this significant sentence:

"It was not the legislature's purpose to limit the provisions of the workmen's compensation act to only such persons as approximate physical perfection."

The *Metcalf* case was followed almost immediately by *McArthur v. Department of Labor & Industries*, 168 Wash. 405, 12 P. (2d) 418, which allowed compensation for the rupture of a duodenal ulcer by overexertion.

In *McCormick Lbr. Co. v. Department of Labor & Industries*, 7 Wn. (2d) 40, 108 P. (2d) 807 (1941), for the first time the attorney general took the position that the 1927 amendment of the definition of the word "injury" did not change the rule announced in the earlier cases, and that the question was no longer open because of the intervening decisions.[9]

---

[9] *Smith v. Department of Labor & Industries*, 179 Wash. 501, 38 P. (2d) 212; *McGuire v. Department of Labor & Industries*, 179 Wash. 645, 38 P. (2d) 266; *Thomas v. Department of Labor & Industries*, 181 Wash. 683, 44 P. (2d) 765; *Johnson v. Department of Labor & Industries*, 184 Wash. 567, 52 P. (2d) 310; *Pulver v. Department of Labor & Industries*, 185 Wash. 664, 56 P. (2d) 701; *Daugherty v. Department of Labor & Industries*, 188 Wash. 626, 63 P. (2d) 434; *Devlin v. Department of Labor*

The case was heard *En Banc,* and again the court reviewed the entire judicial history of the problem but refused to recede from the position announced in the prior cases.[10] Any vestige of doubt should have been removed by *Merritt v. Department of Labor & Industries,* 41 Wn. (2d) 633, 251 P. (2d) 158, in which the court again reviewed all of the cases and declared the rule had been uniformly followed, and again declined to recede.

By repeated decisions covering a period of more than forty years, the decisional law of the state is that:

"An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, *whatever the degree of exertion or the condition of the workman's health.*"[11]

We are told that *stare decisis* does not apply to statutory construction, and it is said that *Petersen v. Department of Labor & Industries,* 40 Wn. (2d) 635, 245 P. (2d) 1161, sustains this view. The court was not there concerned with *stare decisis* nor its application in the field of statutory construction, and indeed, no decision was made upon that point nor could have been.

On the contrary, *stare decisis* applies most vigorously in the field of statutory construction. The summary of 21 C. J. S. 388, § 214, is as follows:

"The doctrine of stare decisis applies with full force to decisions construing statutes or ordinances, especially where

---

*& Industries,* 194 Wash. 549, 78 P. (2d) 952; *Bergagna v. Department of Labor & Industries,* 199 Wash. 263, 91 P. (2d) 551.

". . . So far as the law is concerned every argument advanced by the appellant and more was urged upon this honorable court in the *Metcalf* case and with a greater show of reason because it came just following an amendment of the statute which was thought to eliminate strain as an injury. Those arguments were there rejected and the rule there announced has been frequently reiterated. This is but a petition for a rehearing in the *Metcalf* case and it comes ten years late. . . ." Attorney General's brief, *McCormick Lbr. Co. v. Department of Labor & Industries,* 23.

[10]"The rule above stated has been accepted in this state after much discussion and diversity of opinion. It is now firmly established, and we see no reason for departing from it." *McCormick Lbr. Co. v. Department of Labor & Industries,* 7 Wn. (2d) 40, 60, 108 P. (2d) 807.

[11]*McCormick Lbr. Co. v. Department of Labor & Industries, supra.*

the construction has been long acquiesced in, and decisions construing other statutes are authoritative if such statutes are nearly identical with the one under review."

and it is said in 14 Am. Jur. 287, § 66:

"It has been said that the court of last resort of a state will not overrule one of its prior decisions construing a statute where the legislature has held several sessions since such decision without modifying or amending the statute, because it may be claimed justly that the legislature has acquiesced in the decision, and therefore a fair case is presented for the application of the doctrine of stare decisis."

I am very greatly indebted to Mr. Fred W. Catlett for his painstaking study[12] in which he points out that stability in the law is its most desirable attribute, and, if this were not so, we should have a government of men and not of law.[13] Legal scholars agree with the statement of Mr. Justice Brandeis: "It is more important that the applicable rule be settled than that it be settled right."[14] Stability in the decisional law construing statutes is as important as stability in decisions affecting real property, for the meaning of the statutes should not change with the personnel of the court.

Harmonizing with the prevailing current of judicial opinions in the United States, the decisional law of this state is that the construction placed upon a statute by this court becomes a part of the statute itself. Indeed, this court said so in *Yakima Valley Bank & Trust Co. v. Yakima County*, 149 Wash. 552, 271 Pac. 820:

"It is a familiar rule of statutory construction that, when

[12]"The Development of the Doctrine of Stare Decisis and the Extent to Which it Should be Applied," 21 Wash. L. Rev. 158.

[13]"The majority of this court changes on the average only once every nine years, without counting the changes of death and resignation. If each new set of judges shall consider themselves at liberty to overthrow the doctrine of their predecessors, our system of jurisprudence (if system it can be called) would be the most fickle, uncertain and vicious that the civilized world ever saw." *Hole v. Rittenhouse*, 2 Phila. 411, 417-418.

[14]*Burnet v. Coronado Oil & Gas. Co.*, 285 U. S. 393, 406, 76 L. Ed. 815, 52 S. Ct. 443.

à statute has once been construed by the highest court of the state, that construction is as much a part of the statute as if it were originally written into it."

Other Washington cases are collected in the margin.[15]

Moreover, we have here the re-enactment in 1939 *in haec verba* of the 1927 definition of the word "injury," during which interval there were ten more uniform decisions by this court. Under such circumstances, the legislature is conclusively presumed to be familiar with the decisions construing the statute and to have adopted the statute as so construed. This court said as much in *In re Lindholm's Estate*, 6 Wn. (2d) 366, 107 P. (2d) 562:

"It may therefore be assumed that, by reenacting the proviso, the legislature adopted the construction placed thereon by this court in the *Sherwood* case."

Such is the plain statement in 2 Lewis' Sutherland Statutory Construction (2d ed.) 929, 930, § 499 (333).[16]

Specifically, this court recently held itself bound by the prior construction of the word "employer" in the industrial insurance act, because the legislature had not changed the definition in the intervening nine years. Such was the decision in *Nyland v. Department of Labor & Industries*, 41 Wn. (2d) 511, 513, 250 P. (2d) 551. Here, however, the body of decisional law construing the statute is not only extensive, but the interval of time is three times as great.

A change in the statute as interpreted by this court over a quarter of a century, may not be made by a change in judicial interpretation without encroaching on the function of the legislature. It is now beyond the sphere of judicial action and exclusively within the domain of the legislative

---

[15]*State v. Grabinski*, 33 Wn. (2d) 603, 206 P. (2d) 1022; *In re Lindholm's Estate*, 6 Wn. (2d) 366, 107 P. (2d) 562; *State v. Gustafson*, 87 Wash. 613, 152 Pac. 335. A myriad of cases are collected in the annotation 65 L. Ed. 106. For text statements see Courts, 21 C. J. S. 388, § 214; 14 Am. Jur. 287, § 66.

[16]"The re-enactment of a statute after a judicial construction of its meaning is to be regarded as a legislative adoption of the statute as thus construed." 2 Lewis' Sutherland Statutory Construction (2d ed.) 929, 930, § 499 (333).

See, also, Statutes, 82 C. J. S. 843, § 370 (b); 50 Am. Jur. 461, § 442, note 18.

branch of the government. Such was the rule announced by the supreme court of Kansas in the following six unequivocal sentences:

"Courts do not write legislation. That is the function of the legislature. Our duty is to declare and apply legislative acts and to construe statutes and constitutions in accordance with the will of the law-making power where its construction becomes necessary. When such construction has been given to a law and finally established as a part thereof, it is as much a part of it as if embodied therein in plain and unmistakable language. When that situation exists, it is the province of the legislature alone to change the law if it deems advisable. The courts should not attempt it." *State v. One Bally Coney Island No. 21011 Gaming Table,* 174 Kan. 757, 258 P. (2d) 225.

The question has arisen in at least ten other states and in each instance similar conclusions were reached. Those states are Idaho,[17] Indiana,[18] New Jersey,[19] Wisconsin,[20] Montana,[21] Arizona,[22] Alabama,[23] Mississippi,[24] Missouri,[25] and Texas.[26]

---

[17]*In re Speer,* 53 Idaho 293, 23 P. (2d) 239, 88 A. L. R. 1086.

[18]*Barr v. Sumner,* 183 Ind. 402, 409, 107 N. E. 675, 677. "Were we of the opinion that all those consistent decisions are erroneous we would be without rightful authority to overrule them, because this court is vested with no legislative power."

[19]*Mechanics Finance Co. v. Austin,* 11 N. J. Super. Ct. 399, 78 A. (2d) 408.

[20]*Boutin v. Cardinal Theatre Co.,* 267 Wis. 199, 64 N. W. (2d) 848, 850; *Thomas v. Industrial Comm.,* 243 Wis. 231, 10 N. W. (2d) 206, 210, 147 A. L. R. 103, 108. " 'When that situation exists it is the province of the legislature alone to change the law. The court should not attempt it, whatever may be the notions of judges as to what the law ought to be.' "

[21]*Converse v. Byars,* 112 Mont. 372, 118 P. (2d) 144, 147. "If any change is desired it should come from the legislature, particularly as applied to wills made after the Fratt decision."

[22]*Madrigal v. Industrial Comm.,* 69 Ariz. 138, 144, 210 P. (2d) 967.

[23]*Fidelity-Phenix Fire Ins. Co. v. Murphy,* 231 Ala. 680, 166 So. 604, 607.

[24]*Yelverton v. Yelverton,* 200 Miss. 569, 28 So. (2d) 176.

[25]*Kansas City Public Service Co. v. Ranson,* 328 Mo. 524, 41 S. W. (2d) 169, 173.

[26]*Farmers' Loan & Trust Co. v. Beckley,* 93 Tex. 267, 54 S. W. 1027, 1030; *Thompson v. Kay,* 124 Tex. 252, 77 S. W. (2d) 201, 208.

Anyone familiar with our industrial insurance problem during the six-year interval between the *Frandila* and *Metcalf* cases, knows the amendment of the "injury" definition in 1927 was an expression of legislative dissatisfaction with the *Frandila* decision and a legislative manifestation that another and different rule of law should control.

The writer of this dissent. appealed the *Metcalf* case for that purpose alone, and advised the court in language incapable of misunderstanding, but this court decided otherwise and has adhered to that construction for the intervening quarter of a century, so that it is now an integral part of the statute itself and can only be changed by the legislature.

The powerful argument of Chief Justice Harlan Fiske Stone in his dissent in *Girouard v. United States,* 328 U. S. 61, 76, 90 L. Ed. 1084, 66 S. Ct. 826, is most apropos:

"It is the responsibility of Congress, in reenacting a statute, to make known its purpose in a controversial matter of interpretation of its former language, at least when the matter has, for over a decade, been persistently brought to its attention. In the light of this legislative history, it is abundantly clear that Congress has performed that duty. In any case it is not lightly to be implied that Congress has failed to perform it and has delegated to this Court the responsibility of giving new content to language deliberately readopted after this Court has construed it. For us to make such an assumption is to discourage, if not to deny, legislative responsibility. By thus adopting and confirming this Court's construction of what Congress had enacted in the Naturalization Act of 1906 Congress gave that construction the same legal significance as though it had written the very words into the Act of 1940."

But we are told that the legislature adopted the construction of the statute in the *Mork* case (*Mork v. Department of Labor & Industries,* 48 Wn. (2d) 74, 291 P. (2d) 650) by the re-enactment of the definition of "injury" in Laws of 1957, chapter 70, § 12, p. 277, after the decision in the *Mork* case.

The answer to this is twofold: (1) The court in the *Mork* opinion, which was a Departmental one, did not undertake to overrule the earlier cases on the subject, many of which

were *En Banc* decisions; and (2) by a line of cases recently reaffirmed, the law in force at the time of the injury controls throughout the life of the claim. *Bodine v. Department of Labor & Industries*, 29 Wn. (2d) 879, 190 P. (2d) 89; *Lynch v. Department of Labor & Industries*, 19 Wn. (2d) 802, 145 P. (2d) 265; *Sheldon v. Department of Labor & Industries*, 168 Wash. 571, 12 P. (2d) 751; *Thorpe v. Department of Labor & Industries*, 145 Wash. 498, 261 Pac. 85.

The one hope of salvation and stability from this judicial morass is that the legislative branch of the government will come to the rescue.

Such are the reasons for my dissent.

ROSELLINI, J., concurs with FOSTER, J.

FINLEY, J. (dissenting)—I agree substantially with the well documented dissent of Foster, J., but wish to express my views on this matter, separately.

The majority change the public policy of this state regarding the so-called heart cases arising under the workmen's compensation act. The change is an abrupt one. It is a reversal of a public policy which has stood for approximately twenty-five years (since the *Metcalf* case (1932), 168 Wash. 305, 11 P. (2d) 821) without revision by the legislative branch of state government. The change is accomplished by judicial action in a field which, I think, is primarily the concern of the legislature. Furthermore, I believe that the legislature, through interim committee studies, public hearings, and otherwise, is much better equipped than the court to gather facts and statistics relative to the problem involved. It follows that the legislature should be in a better position to make a more scientific, or at least a more knowledgeable, decision or disposition of this problem of state public policy.

By way of justification of the end result reached, the majority opinion suggests (a) that the court erred approximately twenty-five years ago in the *Metcalf* case, *supra*, and improperly indulged in judicial legislation, substituting its judgment for that of the legislature; (b) that the court today perceives the true legislative purpose of the statute as

enacted by the legislative branch more than twenty-five years ago; (c) that the doctrine of *stare decisis* is inapplicable as to judicial decisions involving interpretation of statutes, and that the doctrine is in no way a restriction upon the majority in effecting a reversal of public policy in the instant case; (d) that it is the responsibility of the court, although somewhat belatedly, to effect the indicated change in public policy as to the heart cases.

If it can be said that the court in the *Metcalf* case indulged in *judicial legislation*, the action of the majority *under the circumstances in the instant case* clearly falls in the same category.

Employers and workmen under the act are the two groups directly concerned as to the public policy question involved. Each group has been effectively and intelligently represented in every session of the legislature for the last twenty-five years. Thus, the problem involved is not one that might go for many years without any attention from the legislature for lack of interest, activity, or legislative representation on the part of persons most concerned. For the above reason alone, it seems to me that the court should do nothing to change the existing state policy in the heart cases, and that, under the circumstances, any change should be left most appropriately to the legislature.

As is well known, the doctrine of *stare decisis* is not an absolute bar to judicial reconsideration of previously decided cases. However, if there ever was an instance where circumstances justified an application of the doctrine of *stare decisis*, the present case, at least in my best judgment, seems to be such an instance. The majority opinion suggests that the result might be different if the doctrine of *stare decisis* was applicable, but it states categorically that *stare decisis* is not applicable to cases involving the interpretation of statutes.

The only authority cited in support of this novel proposition is *Petersen v. Department of Labor & Industries*, 40 Wn. (2d) 635, 245 P. (2d) 1161. The language of that decision does support the view of the majority. However, the

*Petersen* case cites no authority to support the thesis which limits the applicability of the doctrine of *stare decisis*. In fact, the *Petersen* case seems to stand in a field by itself; otherwise, the great and overwhelming weight of authority is to the contrary. The majority decide that the administration of the workmen's compensation act as to the so-called "heart cases" is to be changed. To reach that result, it is unnecessary to discard the stability provided through the doctrine of *stare decisis* by stating it does not apply to judicial decisions involving the interpretation of statutes.

It seems to me that the real problem at hand is whether it is the responsibility of this court to effectuate a significant change in the public policy of this state as to the heart cases under the workmen's compensation act. No facade of resounding legal rhetoric should obscure this fact or the fact that the decision of the majority does make an abrupt change in the public policy of this state in the so-called heart cases.

I believe that the action of the majority in the instant case is untimely, undesirable, and unnecessary for the very practical reasons indicated hereinabove. It is my best judgment that discretion is the better part of valor, and that, in the instant case, the court should defer to the prerogatives and the judgment of the legislature, as well as to the possibility of action by that branch of state government.

ROSELLINI, J., concurs with FINLEY, J.

HUNTER, J., did not participate.

---

June 9, 1958. Petition for rehearing denied.