[No. 29926. Department Two. May 9, 1947.]

CHARLIE R. HIGGINS, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES *et al., Respondents.*[1]

*Charles A. Turner,* for appellant.

*The Attorney General, Phil H. Gallagher* and *J. Anton Sterbick, Jr., Assistants,* for respondent Department of Labor and Industries.

*Reuben C. Carlson* and *Merton Elliott,* for respondent E. I. du Pont de Nemours & Company.

HILL, J.—Appellant, who lives in Everett, went to Hanford, Washington, in October, 1943, to go to work as a truck driver for E. I. du Pont de Nemours & Company, Inc., hereinafter called Du Pont, on the so-called Hanford project. Physical examination disclosed that he had high blood pressure, and he was refused employment. He then worked as a

[1]Reported in 180 P. (2d) 559.

truck driver for one of the subcontractors on that project, and, in December, 1943, he was hired by Du Pont, apparently without a medical examination, as a fireman for stationary boilers.

He worked in that capacity from December 4, 1943, to June 8, 1944, averaging about six days a week on a ten-hour shift from four p. m. to two a. m. He fired a battery of from five to seven boilers, shoveling six to seven tons of coal à shift, and cleaned the fires about three times each night, taking out about three wheelbarrow loads of ashes and clinkers each time. These were moved in a wheelbarrow a distance of about one hundred feet, though during the latter part of his employment they were sluiced out. He used, in tending the fires, a rake weighing approximately fifty pounds and a ten-foot slice bar weighing about twenty-five pounds. The weather was hot, and there were frequent sand or dust storms during the latter part of his stay at Hanford.

He lost thirty-nine pounds while on the job and finally quit because he was no longer able to continue doing the work. He states that, since quitting this employment, he has been unable to work.

In his claim for compensation, filed August 15, 1944, he described the "accident" as follows:

"Shoveling coal firing battery of 5 to 7 boilers, 9' fire box. Examining doctor said I had weak heart before going to work on this job. The heavy work shoveling and firing with intense heat prevailing on the job and continued sandstorms caused my heart to give out completely could not breathe and strength gave out."

Appellant's claim was rejected by the supervisor of industrial insurance on September 27, 1944, on the grounds that there was no proof of injury sustained in the course of employment, and that the claimant's condition was not the result of injury as defined by the workmen's compensation act.

An appeal to the joint board of the department of labor and industries followed. The claimant's testimony was

taken on January 10, 1945, and, when asked why he discontinued his employment at Hanford, he said:

"Well, it was just getting me down, that is all, it was too hard on my heart and it was getting so I couldn't breathe I couldn't get my breath so I had to quit."

It was not until Dr. Frederick Slyfield's examination in February of 1945, that a diagnosis of chronic pulmonary emphysema was given as the reason for the claimant's present physical condition. The doctor, in his report, defined chronic pulmonary emphysema as "ballooning or distention of the air cells and loss of elasticity of the lung tissue," and in testifying he described it as follows:

"Well, emphysema consists of a dilatation or ballooning of the individual air cells, millions of them.   .   .   . In the lung.  The air cells become distended, stretched out, full of air, which it does not expel which causes it to lose its elasticity, that is the alveolar walls of the air cells loses its elasticity so that it does not contract and squeeze out its air.  Also the wall of the alveolus, the air cell, becomes fibrous so that the exchange—the normal exchange of gases, carbon dioxide for oxygen doesn't take place sufficiently, the result is the entire chest is more or less ballooned up, a bunch of air goes in and out through the respiratory motions but there is very limited exchange of gases, consequently the patient is short of breath, either at rest or on slight exertion.  His vital capacity is very low.  We don't know what to do for this condition.  It is probably an incurable state, usually classified as one of the degenerative diseases coming on in middle life, though it sometimes occurs for various reasons earlier, but it is quite incapacitating.  A man is perfectly able to do sedentary work, desk work, but he becomes more and more unable to carry on physical labor."

When questioned as to the connection between the work which appellant was doing for Du Pont and this chronic pulmonary emphysema, the doctors testified as follows:

*W. D. Smith (produced by the department)*: "Well, only in this way there might be a connection in that he already had this condition which was getting progressively worse all the time, then he comes along and does some heavy work which makes him breathe harder and deeper and that probably ruptures some more of these air cells in there—dilates

them further at least—and makes the breathing more difficult. That would be classified in my opinion as aggravation, although the condition was not caused by his work."

*Frederick Slyfield (produced by the employer)*: "I feel that the work, as I say, has no effect on the lungs, the lung capacity wasn't sufficient for that work, but work doesn't make it worse. He simply isn't able to do it because he can't get enough breath. . . . I don't think it has any effect but the effect of loss of weight, and loss of strength, the work was too hard for him, but it doesn't—he shouldn't have done that work when he went over there."

*A. E. Braden (produced by claimant)*: "I think it would aggravate his trouble very much. . . . It would make him worse I think."

The joint board, on September 20, 1945, arrived at the same conclusion as that previously reached by the supervisor.

An appeal to the superior court of Snohomish county followed, and the cause came on to be heard before a jury on December 6, 1945. After all of the testimony taken before the joint board had been introduced, there was a challenge to the sufficiency of the evidence. The trial court, agreeing with the supervisor and the joint board that there was no proof of injury as defined in the workmen's compensation act, sustained the challenge and entered judgment dismissing the appeal from the decision of the joint board.

The cause is now before this court on an appeal from the judgment of the superior court and presents a single question: Was there sufficient evidence from which a jury could have found that appellant had sustained an injury within the purview of the statutory definition as set forth in the workmen's compensation act (Rem. Rev. Stat. (Sup.), § 7675 [P.P.C. § 709-1])? The answer is no.

█ For a workman to be entitled to compensation out of the accident fund, he must have been injured in the course of his employment (Rem. Supp. 1941, § 7679 [P.P.C. § 705-1]). The word "injury," as used in the act, means

" . . . a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom." Rem. Rev. Stat. (Sup.), § 7675.

This court has emphasized again and again that there must be a definite and particular occurrence to which the injury can be attributed: a happening which can be fixed at a point of time. That was the rule when the definition of injury was as follows:

"The words 'injury' or 'injured' as used in this act refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease. . . ." Laws of 1921, chapter 182, p. 720, § 2.

See *Shadbolt v. Department of Labor & Industries*, 121 Wash. 409, 209 Pac. 683.

The present definition, as changed in 1927, makes even more explicit that the injury must be a sudden and tangible happening.

In *Pellerin v. Washington Veneer Co.*, 163 Wash. 555, 2 P. (2d) 658, a workman sued his employer for damages because, through the course of his employment, he had been poisoned by breathing certain vapors, to the extent that he was incapacitated from hard labor for the rest of his life. It was contended by the employer that he came under the workmen's compensation act. Answering this contention, the court, after quoting the present definition of injury, then newly adopted, said:

" 'Traumatic' is defined by Webster as 'a wound; of or pertaining to wounds; applied to wounds.' The words in the act of 1927, defining injury, referring to a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, therefore undoubtedly mean some blow or wound, suddenly and tangibly happening, producing an immediate or prompt result as opposed to something in the nature of occupational disease with which we dealt in the *Seattle Can Co.* decision, *supra* [147 Wash. 303, 265 Pac. 739].

"The manifest intention of the legislature in the enactment of the new definition of injury was to make more certain the definition of injury and make it apply strictly to sudden and tangible happenings occurring from without of a traumatic nature producing an immediate or prompt result, as distinguished from anything like an occupational disease.

"We are convinced that this case does not fall within the workmen's compensation act as amended."

In *Flynn v. Department of Labor & Industries*, 188 Wash. 346, 62 P. (2d) 728, Judge Tolman, speaking for the court, said:

"The statute is in no respects ambiguous or uncertain. It is plain, clear, concise, and is therefore not subject to construction, but the language used must be given its plain and ordinary meaning. Had it been the legislative intent to cover every kind of physical impairment occurring while a workman was in the course of his employment, it might very easily have employed language to express that intent, but it did not do so.

"The statute, segregated into its component parts, indicates very clearly that first, there must be a 'happening;' second, the happening must be of a 'traumatic nature;' and third, the happening must occur 'from without.'

"It seems apparent that the two phrases, 'of a traumatic nature' and 'occurring from without,' both modifying, as they do, the word 'happening,' can only mean that there must be an external act or occurrence which caused the injury and that such act or occurrence must be 'of a traumatic nature.' The source as well as the nature or character of the 'happening' are both determinative factors under the statutory definition."

To this analysis of the definition of injury, we would add that the "happening" must be sudden and tangible.

In *Henson v. Department of Labor & Industries*, 15 Wn. (2d) 384, 130 P. (2d) 885, the court points out the distinction between injury and disability:

"Disability means the impairment of the workman's mental or physical efficiency. It embraces any loss of physical or mental functions which detracts from the former efficiency of the individual in the ordinary pursuits of life. It connotes a loss of earning power. 2 Schneider, Workmen's Compensation Law (2d ed.) 1332, § 400; 28 R. C. L. 819, § 105; *London Guarantee & Accident Co. v. Industrial Commission*, 70 Colo. 256, 199 Pac. 962.

"The difference between the meaning of the words is more apparent when we consider the distinct difference between traumatic injury and occupational disease. The former is one of notoriety, a happening which can be fixed at a point in time, while the latter, especially silicosis, has a slow and insidious approach and in many cases does not manifest itself until after the lapse of a considerable length of time."

In every one of the Washington cases relied upon by appellant, there was a sudden and tangible happening of a traumatic nature, producing an immediate or prompt result.

In *Frandila v. Department of Labor & Industries,* 137 Wash. 530, 243 Pac. 5, which was decided under the earlier, fortuitous-event definition of injury, the court said:

"It is plain from the evidence that the hardened arteries, coupled with over-exercise in the course of employment, caused either the hemorrhage or embolism. The chopping of the root was a *definite and particular occurrence,* which was the contributing, proximate cause of the death." (Italics ours.)

In *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821, the present definition of injury was discussed, and the court said:

"In *Pellerin v. Washington Veneer Co.,* 163 Wash. 555, 2 P. (2d) 658, which was decided after our legislature had thus amended the definition of the word 'injury,' the court held that disability produced by carbon bisulphide poisoning in the course of, and as a result of, the employment, is not an 'injury' within the meaning of the workmen's compensation act. In its decision, the court said:

" 'The manifest intention of the legislature in the enactment of the new definition of injury was to make more certain the definition of injury and make it apply strictly to sudden and tangible happenings occurring from without of a traumatic nature producing an immediate or prompt result, as distinguished from anything like an occupational disease.' . . .

"Funk & Wagnalls' New Standard Dictionary of the English Language defines the word 'traumatic' as follows: 'Of or pertaining to trauma.' 'Trauma' is defined by the same authority as, 'any injury to the body caused by violence.' Had Mr. Metcalf's violent efforts sawing the log, in an attempt to clear the road for Mr. Benson's passage, resulted in a sprained wrist, a torn tendon or a dislocated shoulder, any one of those injuries would clearly have been

" ' . . . a sudden and tangible happening of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom.'

"The fact that his arteries had so hardened that death was likely to result 'from a sudden and tangible happening of

a traumatic nature,' does not deprive Mr. Metcalf's widow and minor child of their right to statutory benefits. It was not the legislature's purpose to limit the provisions of the workmen's compensation act to only such persons as approximate physical perfection."

In *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218, we quoted some of the language of the *Metcalf* case set forth *supra,* and said:

"There is no question that the deceased was engaged in extrahazardous employment at the time he was injured, nor that the injury was a sudden and tangible happening of a traumatic nature under the statute as we have heretofore construed it, nor can there be any serious question that the injury happening on October 21st was the cause of the decedent's death."

In *Bergagna v. Department of Labor & Industries,* 199 Wash. 263, 91 P. (2d) 551, four of the judges vigorously insisted that the facts did not bring the case within the statutory definition of injury. There was a sudden and tangible happening—the collapse and death of a miner

" . . . while engaged in heavy muscular work, a relatively short time after he had experienced some shock or fright as the result of the fall of a mass of rock from the roof of the mine."

The court was sharply divided over the question of whether the "work the decedent was doing helped in a material degree to cause his death."

In *McCormick Lbr. Co. v. Department of Labor & Industries,* 7 Wn. (2d) 40, 108 P. (2d) 807, the court said that the *Pellerin* and *Flynn* cases, *supra,* correctly construed the statute as to the definition of injury. The question on which the court divided, as in the *Bergagna* case, *supra,* was whether the work which the decedent was doing helped in a material way to cause his death. A logger afflicted with heart disease had collapsed and died while sawing a tree, and, since there was evidence to support the finding of the department of labor and industries that there was a causal relation between the workman's exertion and his death, an award to his widow was sustained, even though at the time

of his collapse he was not putting forth any unusual exertion. There was a sudden and tangible happening, and an immediate and prompt result. The element of the statutory definition of injury which was here considered was what constitutes "of a traumatic nature." The other decisive question in the case was whether the injury was incurred in the course of the decedent's employment.

*Northwest Metal Products v. Department of Labor & Industries,* 12 Wn. (2d) 155, 120 P. (2d) 855, is the only one of the so-called heart cases in which the workman did not die. Barlia, the injured workman, testified that his trouble dated from a period in July or August of 1938, when he was put to work on a pipe rolling machine used in crimping metal, which required the exercise of hand pressure. He complained to the foreman that the work was too heavy for him and was causing him considerable pain. Although the pain left him after he had ceased operating the crimping machine, he remained in a weakened condition and found any work difficult. There was a sudden and tangible happening which apparently "lighted up" or made active a quiescent or dormant heart condition.

In *Atkinson Co. v. Webber,* 15 Wn. (2d) 579, 131 P. (2d) 421, 137 P. (2d) 814, Robert Webber was found in a dying condition near his tractor. Death was the result of coronary thrombosis. There was a sudden and tangible happening, producing an immediate or prompt result. Again the questions on which the court divided were whether it was of a traumatic nature, and whether the injury, if it was an injury, was sustained in the course of his employment. The majority held that the record supported the finding of the department of labor and industries that the coronary thrombosis was due to exertion in the course of Mr. Webber's employment.

The foregoing is not and does not purport to be a consideration of all the "heart cases" or the cases dealing with what constitutes an injury within the statutory definition contained in the workmen's compensation act. It is an analysis of each of the Washington cases cited by the appellant, and in each of those cases it was undisputed that there was a

sudden and tangible happening followed by an immediate or prompt result, whatever may have been the differences of opinion as to the presence of the other elements of the definition of injury. There is such a happening in every one of the heart cases, down to and including the most recent one, *Long-Bell Lbr. Co. v. Parry,* 22 Wn. (2d) 309, 156 P. (2d) 225.

■ There is no sudden and tangible happening in the present case, no matter of notoriety, nor an event which can be fixed in time, but rather an incapacity due to the relatively slow and insidious inroads of a progressive and apparently incurable disease. It is testified that its progress was accelerated by the character of the work which appellant did for Du Pont at Hanford, but that falls far short of establishing an injury within the statutory definition with which we are here concerned.

The judgment of the trial court is affirmed.

MALLERY, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.