[No. 35085. *En Banc.* May 26, 1960.]

INEZ L. THIEL, *Respondent*, v. DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.[1]

*The Attorney General* and *William J. Van Natter, Assistant*, for appellant.

*Boose & Garrison*, for respondent.

[1] Reported in 352 P. (2d) 185.

HILL, J.—This is another heart case. An application by the widow of a workman for a pension under our workmen's compensation act was denied by the department of labor and industries; the supervisor of industrial insurance having concluded that the workman's death was due to a heart involvement and not "to any act or circumstances related to his employment."

The board of industrial insurance appeals sustained the action of the department. An appeal to the superior court was heard on the certified record made by the board, and resulted in the jury's answering in the affirmative the interrogatory "Was the death of the plaintiff's husband on September 22, 1956 a proximate result of any incident in the course of his employment on September 21, 1956?" The judgment on that verdict, in effect, directed that the claimant be granted a pension. The department appeals, asking for a dismissal of the claimant's appeal to the superior court, or for a new trial.

Our primary concern is whether there is any evidence to establish a causal relationship between the workman's death and his employment.

The workman, who was forty-seven years old and in apparent good health, died in his sleep shortly after midnight on September 22, 1956. He had been employed as "a handy man" for the preceding fifteen months by a business known as "The Farm Shop," which did repairing of farm and industrial machinery. The workman did spray painting as part of his duties; and, on September the 21st he had sprayed aluminum paint on a sheet metal box "4′ x 6′ in size." This work had been done in the open air.

The claimant testified that when her husband arrived home from work that evening, the exposed portions of his body (face, neck, hands) were covered with aluminum paint. He watched the Friday night fights on television, as was his custom, and then had his dinner, finishing about 7:30 p. m. He was a hearty eater, and "ate his normal amount." His wife then assisted him (because of an injury to his left thumb) in shaving and cleaning up. He watched television until about 10:35 p. m., after which he fixed and

consumed a sandwich and a cup of coffee. He retired about 11:00 p. m., and went to sleep shortly thereafter. His wife was disturbed by his loud breathing, which she thought was snoring; shortly after midnight he took several loud breaths and was dead. An osteopathic physician and surgeon, Dr. Arthur E. Borchardt, living in the neighborhood, was called immediately. Later, he and another local doctor performed an autopsy. Specimen portions of the anatomy were submitted to pathologists, who determined the cause of death to be " 'acute right heart failure secondary to chronic pulmonary fibrosis and emphysema'."

The claimant's theory of causation, supported by the testimony of Dr. Borchardt on direct examination, was that the immediate precipitating factor in the workman's acute heart failure was an edema in the lung. He explained how the edema would cause additional heart strain or effort, and testified that from his own examination, and the facts as supplied to him in a hypothetical question, the only possible cause of the edema was either an acute allergy or irritant agent. It was, further, his opinion, that, since nothing else was suggested, the irritating factor was probably one or more of the ingredients of the aluminum paint which the workman had been spraying that day.

If this was the extent and substance of Dr. Borchardt's testimony, the jury would be entitled to accept it in preference to that of two specialists in diseases of the heart and lungs: Dr. Phillip H. Narodick and Dr. K. M. Soderstrom, who testified for the department. It was their opinion that the aluminum paint used by the workman could not have contributed to his death, because the only ingredient of the aluminum paint which was dangerous to health was that of the hydrocarbon vehicles in which the aluminum pigment was suspended. Their testimony was that this hydrocarbon, while a highly toxic material, has no effect unless it enters the blood stream in a highly concentrated form; and, if this were to happen, the individual affected would become sick and nauseated at once. Dr. Soderstrom emphasized that any irritant that was inhaled could not by-pass the nose and throat, and that they would have been first irritated—

of which there was no evidence in this case. Dr. Narodick attributed the edema, which was found in the lung tissues on autopsy, to a cardiac decompensation, stating that this was also indicated by the fact that there was edema in the liver. Of the autopsy findings by the pathologists, he said:

". . . 'This is just the every day autopsy findings of somebody that dies as a result of chronic pulmonary fibrosis, emphysema, chronic heart disease. . . .' "

We are not concerned with the testimony of the doctors from the standpoint of weighing it; but from the standpoint of its pinpointing the clear-cut issue of whether there was any causal relationship between the death of the workman and his employment.

The contention, on this appeal, is that after Dr. Borchardt's cross-examination his testimony on direct examination was repudiated and that the jury's verdict rests on nothing more substantial than conjecture.

Two excerpts from the cross-examination will be more revealing than any summation or appraisal of it. In reading the first excerpt it must be remembered that Doctor Borchardt had accepted the report of the pathologists as a basis for the opinion he had expressed on direct examination. That report had contained the statement:

". . . The right ventricle wall is increased in thickness, measuring 6 mm. (normal 3 mm.) The left ventricular wall is increased in thickness measuring 1.4 cm. The normal thickness is about 1.1 cm. . . ."

"Q. Doctor, is your opinion, that there was causal relationship between the aluminum and heart failure, based upon the assumption that there was no hypertrophy of the right heart? A. As I said before, we have to assume that there is a causal relationship in this particular case. Q. Was your opinion based upon your previous statement that there was no hypertrophy? A. That was one of the factors that entered into it. Q. That is material to your opinion? A. Yes, that is very much so. Q. Doctor, if you were asked to assume then that the right ventricle wall was 6 mm. in thickness, rather than the normal 3 mm. in thickness, would your opinion be different? A. *I guess I talked myself right into a trap. That kind of throws my testimony cocked-hat. But he did show—I hadn't read this completely here. This*

*did show*—I was going from macroscopic, when removed the heart, that there was no dilatation, no particular enlargement. But he does show a definite increase. That means that there was a strain over a period of time." (Italics ours.)

(The italicized portion was stricken at the request of claimant's counsel, and was not read to the jury. The department urges that if the appeal from the board of industrial insurance appeals is not dismissed, it should be sent back for a new trial because of this striking of the doctor's own appraisal of his testimony.)

The second excerpt is as follows:

"Q. Well, Doctor, you have stated that you feel this edema was the cause of—was the probable cause of this man's demise, simply because you had no other explanation for the increase in strain that was necessary to cause the right ventricle to stop operating? A. That is correct. Q. Well, Doctor, if you were to assume that the man had eaten a heavy meal on the evening before he died, and furthermore had a sandwich and some coffee before he went to bed, and that upon autopsy the stomach was found large, smooth and filled with a great deal of partially digested food, wouldn't that prove another explanation for the increased strain on his circulatory system and to his right ventricle? A. Factor that must be considered. Q. Considering that, wouldn't you say that was at least as probable—wouldn't you say that was as probable an explanation as the moderate edema that was found on death? A. Well, yes. Q. Wouldn't it be true, also, Doctor, that any edema from this—strike that question. Under those circumstances, then, Doctor, you couldn't say that the exposure or the purported exposure to aluminum was the most probable cause for his death, could you? A. As I have stated before, it is a possibility, or probability that must be considered. Q. *It is not the most probable cause, is it, Doctor, in view of all these facts?* A. *No.* Q. It is just a possibility along with the others? A. That is right." (Italics ours.)

■ When Dr. Borchardt retracted his indispensable testimony: that the exposure to aluminum paint was the most probable cause of the workman's death, and admitted that it was not the most probable cause, he left the claimant's case without any factual foundation. *Lyle v. Department of Labor & Industries* (1956), 49 Wn. (2d) 540, 304

P. (2d) 668; *Sawyer v. Department of Labor & Industries* (1956), 48 Wn. (2d) 761, 296 P. (2d) 706; *Stampas v. Department of Labor & Industries* (1951), 38 Wn. (2d) 48, 227 P. (2d) 739; *Rambeau v. Department of Labor & Industries* (1945), 24 Wn. (2d) 44, 163 P. (2d) 133.

We find it unnecessary to pass on the question of whether the italicized portion of the quoted statement from Dr. Borchardt should have been stricken; nor is it necessary to consider the line of cases dealing with expert testimony based on an erroneous assumption of fact, such as *Rode v. Department of Labor & Industries* (1955), 47 Wn. (2d) 619, 289 P. (2d) 354, and *Parr v. Department of Labor & Industries* (1955), 46 Wn. (2d) 144, 278 P. (2d) 666. It is clear that inasmuch as Dr. Borchardt's statements supporting the claimant's theory were repudiated on cross-examination, there was no evidence or inference therefrom in the certified-appeal-board record to support the jury's answer to the interrogatories, and that the trial court erred in denying the department's motion to dismiss the claimant's appeal from the board of industrial insurance appeals; and erred again in failing to grant its motion for judgment n.o.v.

The judgment appealed from is reversed, with directions to enter an order dismissing the claimant's appeal to the superior court from the order of the board of industrial insurance appeals.

WEAVER, C. J., MALLERY, DONWORTH, and OTT, JJ., concur.

FINLEY, J. (dissenting)—The majority opinion states:

"When Dr. Borchardt retracted his indispensable testimony: that the exposure to aluminum paint was the most probable cause of the workman's death, and admitted that it was not the most probable cause, he left the claimant's case without any factual foundation. *Lyle v. Department of Labor & Industries* (1956), 49 Wn. (2d) 540, 304 P. (2d) 668; *Sawyer v. Department of Labor & Industries* (1956), 48 Wn. (2d) 761, 296 P. (2d) 706; *Stampas v. Department of Labor & Industries* (1951), 38 Wn. (2d) 48, 227 P. (2d) 739; *Rambeau v. Department of Labor & Industries* (1945), 24 Wn. (2d) 44, 163 P. (2d) 133."

It seems to me that this demonstrates that the majority

are weighing and evaluating the evidence. This, I think, is the function of the jury rather than this court on appeal. Inconsistencies in the testimony of a witness are matters affecting the weight and credibility thereof, and these matters are exclusively within the province of the jury. *Dupea v. Seattle* (1944), 20 Wn. (2d) 285, 147 P. (2d) 272, and cases cited therein. I dissent for this reason.

ROSELLINI, FOSTER, and HUNTER, JJ., concur with FINLEY, J.

FOSTER, J. (dissenting)—While I have signed Judge Finley's dissent, I think the reasons for this view are nowhere better stated than by Mr. Justice Brennan in *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U. S. 107, 4 L. Ed. (2d) 142, 80 S. Ct. 173 (Nov., 1959).

The statement is:

"The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony, into consideration. See *Sullivan v. Boston Elevated R. Co.*, 185 Mass. 602, 71 N. E. 90; *Miami Coal Co. v. Luce*, 76 Ind. App. 245, 131 N. E. 824. Though this case involves a medical issue, it is no exception to the admonition that, 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. . . . The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . . . Courts are not free

to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' *Tennant v. Peoria & Pekin Union R. Co.*, 321 U. S. 29, 35. The proofs here justified with reason the conclusion of the jury that the accident caused the petitioner's serious subsequent illness. See *Rogers v. Missouri Pacific R. Co.*, 352 U. S. 500."

September 29, 1960. Petition for rehearing denied.