[No. 36479.   Department Two.   June 20, 1963.]

JOHN E. WOODS, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[*]

*McCrea, Kafer, Gissberg & Wilson* and *Clarence J. Coleman,* for appellant.

*The Attorney General, John J. Quine* and *Franklin K. Thorp, Assistants,* for respondent.

[*] Reported in 382 P. (2d) 1014.

DAWSON, J.†—On September 3, 1958, appellant John E. Woods, a 64-year-old man, suffered a coronary occlusion while engaged in peeling a large cedar tree. He was employed, and had been for 3 years, by J. R. Keaton in a two, and sometimes three-man operation. He was engaged primarily as a donkey engine operator. However, he also trimmed trees, measured pulpwood, and, on occasion, "peeled" or "barked" cedar logs, a necessary process in building a pole.

His claim for benefits under the Workmen's Compensation Act was rejected on December 3, 1958, by the supervisor, upon the ground that claimant had not sustained an "injury" within the meaning of the act. Thereafter, the Board of Industrial Insurance Appeals sustained the supervisor's order, and claimant appealed to the superior court.

Prior to trial, the department, in effect, challenged the sufficiency of the evidence by its motion to dismiss. *Abbott v. Department of Labor & Industries,* 49 Wn. (2d) 774, 307 P. (2d) 254. This motion was granted, and claimant's case was dismissed. This appeal followed.

■ 1. The department urges that the medical evidence fails to establish a causal relationship between the injury and employment, in terms of probability, and suggests this ground as a supporting base for dismissal. In other words, the trial court shall be affirmed, if its ruling is correct on any ground. *Peterson v. Hagan,* 56 Wn. (2d) 48, 351 P. (2d) 127.

There was the usual lack of medical unanimity, but the testimony of Dr. Cedric E. M. Tuohy, Jr., who testified on behalf of claimant, we think is more substantial than conjecture. He testified on direct examination as follows:

"Q. Now, Doctor, have you any opinion as to any connection between the work on the poles and the incident of this heart attack? A. In my prior experience with Mr. Woods, I had never been consulted concerning any chest or cardiac difficulties of his, although I had treated for some other things, and I had checked his blood pressure

---

†Judge Dawson is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

prior and listened to his heart previously on other occasions and we had not had any indication that there was any cardiac difficulty or symptomatology in his case until the time when I was called. One would, could presume that an exertion of this type could be the instigating factor in bringing about an occlusion. Q. In this particular case, Doctor, do you have any opinion as to whether that exertion was the initiating factor that took place? A. Well, since he did not have any other difficulty and since this occurred when he was doing this heavy exertion, the conclusion would be drawn that this was the instigating factor."

On cross-examination, the doctor testified:

"Q. Now, doesn't it boil down to this, Doctor, your testimony about you feeling that the exertion could have brought on the occlusion, is based— A. I said I thought it could have been the instigating factor. Q. Would you specifically designate what exertion would be the instigating factor in this case? A. In this case, this man was barking this log, which is a very strenuous activity, at the time he experienced pain, therefore, I would presume that that is the moment that he had a coronary occlusion. . . . Q. Doctor, the fact that there was no symptomatology before 9-3-58, in and of itself does not mean that the man couldn't have been suffering from a disease process within the coronary arteries, isn't that true? A. It is essentially true. Q. And the coronary occlusion, having the occlusion of the diameter of the heart vessels itself, could be just as easily have brought about the progressiveness of the disease, isn't that true? A. This could be true, but in a person carrying on the strenuous activities that he had from day to day, one would not think that this were true. Q. Why is that, Doctor? A. Well, usually to me if he had a narrowed—severely narrowed coronary arteries, then if he were carrying on an active job in the woods as he was, he should have had some angina pectoris, one would think some pain of a coronary nature. . . .

"Q. Now, Doctor, the exertion that you speak about bringing on this occlusion, you mentioned that on the day of injury, on 9-3-58, that he was, in the history received, that while peeling, barking some poles he was seized with a severe pain, is it your opinion that barking poles in and of itself is a strenuous exertion? A. Yes, I think it is a strenuous exertion. . . . Q. I see. Then assume as a fact, Doctor, that this man had for some three years prior

consistently, and not 8 hours a day constantly, but consistently intermittently had trimmed and barked poles, and in light of the fact that you state that this is severe exertion, does that in any way affect your opinion as to causal relationship? . . . A. I don't think it alters my opinion, No. Q. Well, then Doctor, it comes down to this, if the man is doing—if this man has been doing what you consider severe exertion for 3 years, in barking poles, why would this particular incident cause you to feel that this was the particular instance that produced the occlusion if it was not an unusual type of thing? A. Because the occlusion was at the time he was doing this particular activity. Q. Even though this activity was routine? A. He gave me the opinion that this was not a routine activity, that although he had previously done it, this was not a routine activity. Q. I see. And you had received the history 2 days later that he had worked very hard the day prior to September 3, namely September 2, 1958? A. Yes, I did. Q. Does that affect your opinion as to probabilities—as to causal relationship of this heart condition? A. No."

■ Dr. Tuohy's testimony as to causal relationship is essential to appellant's cause. If the doctor repudiated the same by direct retraction or by inconsistencies and contradictions, we must consider their effect. *Thiel v. Department of Labor & Industries,* 56 Wn. (2d) 259, 352 P. (2d) 185.

■ His inconsistency, if any, is found in one answer and one interjection, wherein the doctor used the auxiliary verb "could", which, in normal usage, merely expresses a contingency. If this be termed a retraction, it is only because we take the word out of context and disregard all else. The doctor is not a lexicographer; nor does the law expect such a qualification or demand that answers be entirely positive and categorical. We think his testimony was responsive, consistent, and quite positive, when interpreted in the light of the entire examination. If accepted, it meets the test of the following standard: "The rule is that it must appear from medical testimony that the incident relied upon was more likely than not the cause of the injury claimed. . . . ." *Barrett v. Depart-*

*ment of Labor & Industries,* 52 Wn. (2d) 439, 441, 325 P. (2d) 896.

So considered, we should not vitiate the doctor's testimony as a matter of law. Its weight is for the jury, not the court. *Halder v. Department of Labor & Industries,* 44 Wn. (2d) 537, 268 P. (2d) 1020.

2. Appellant urges that the evidence in the record bearing on the question of industrial injury, as defined by the Workmen's Compensation Act, offers room for a difference of opinion in the minds of reasonable men, and thus withstands the challenge to its sufficiency. *Abbott v. Department of Labor & Industries, supra.*

■ Since *Windust v. Department of Labor & Industries,* 52 Wn. (2d) 33, 323 P. (2d) 241, it is certain that " . . . a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, . . ." (RCW 51.08.100) does not cover the normal, routine act of an employee. But the *Windust* case did not disturb the rule that

" . . . a workman with a pre-existing heart condition may suffer, as the prompt or immediate result of an unusual exertion, a death or disability which constitutes an injury and thus entitles him, or his dependents, to compensation. . . ." *Favor v. Department of Labor & Industries,* 53 Wn. (2d) 698, 705, 336 P. (2d) 382.

Is the evidence in the case at bar, then, sufficient to take the case to the jury on the question of "unusual exertion?"

A portion of appellant's testimony, with reference to the exertion required of him, follows:

"Q. Go ahead and tell about it, what happened? A. Well, when he fell this tree why I started to—he sawed the butt of it off, what they call butted, so it would start to make a pole, and I started in to pull the bark off of it there and the bark was sticking very tight, the bark had began to stick— . . . Q. And you say the bark on this pole was sticking? A. Yes. . . . Q. What process were you using to take it off here? A. With an ax, and I would loosen the end of the bark with an ax, 3 or 4-inch strip here, 3 or 4 inches wide, then take ahold of it with my arms and jerk on it (indicating). Q. Was there any different effort re-

quired in this process than a normal process and if so, will you explain fully? A. Well, with the normal process of peeling a pole, of course, when it is slipping, you loosen the piece 3 or 4 inches wide the same as I was doing in this case, and it pulls off quite easily, sometimes 8 or 10 feet, sometimes a full length of a pole if it is just a short pole. On a smaller pole, like 20-foot pole, maybe 7 or 8 inches in diameter, why you take a jerk and it will be going sometimes 15 to 20 feet, and on a bigger pole, of course, when the bark is peeling good why it is just about the height of your arm that it will raise it, pull it up maybe, say as far as the end of the table, it varies according to the way the bark is slipping and the thickness of the bark, but this particular tree—I, of course, I might have been feeling bad or something that morning, I don't know, but it seemed like the toughest tree I ever peeled, but it seemed to me the bark seemed to be extra thick for a cedar and it was well, it's—I don't know how to explain it, was sticking, so you would pull it and generally pull only a foot or two at a time, and then it would break instead of peeling any farther. Then you would run it down to find out where to run your ax under the bark again and then you would pull off another piece wherever it broke to.

"Q. Would you be able to compare the effort that required on this particular tree to the ordinary effort that you mentioned on a tree that had sap so it was slipping? A. Well, my personal opinion is that it was—that particular tree I was peeling was twice as hard or more than the average cedar that we peeled during the summer. Q. Did anything happen to you personally while you were in this operation of peeling this thing? A. Well, I had been working on it a few minutes, I don't know just how much, I had probably peeled one side of the pole for a distance of 6 or 8 feet when I was jerking on this thing, that a severe strain in my chest, and it run all the way down my left arm and in my right arm, it seemed to be up in my wrist and my elbow, but my—both wrists had a terrific pain in, also in my chest, and the pain was so great that it made me sick and nauseated and I had to sit down and I sit down and leaned back against a stump for, oh, this had just been, I guess, because I was very sick, I would say 15 or 20 minutes. . . .

"Q. It is your testimony that this tree was a 50-foot pole, are you sure it wasn't smaller, between 30 and 35 foot? A. I don't know what the tree made, we talked about it

when he was looking up before he fell it, and we figured that it was the nicest pole on the setting."

The word "effort" is defined in Webster's New Twentieth Century Dictionary (2d ed.) to mean: "2. a try, especially a hard try; attempt; endeavor." "Hard," a simple, blunt word, is defined in Webster's, *supra,* to mean: "5. demanding great physical or mental effort or labor; fatiguing; difficult; specifically, (a) difficult to do; as *hard* work; . . . ."

█ Respondent has argued that "twice as hard" or "twice the effort" merely measures the consumption of time; however, in the light of these definitions, we believe "twice the effort" or "twice as hard" does not necessarily lengthen the period within which effort is expended, but is rather a measure of present effort.

Respondent has also suggested that "twice as hard," as a comparison, fails to meet the test of *Towne v. Department of Labor & Industries,* 51 Wn. (2d) 644, 320 P. (2d) 1094, because it fails to encompass the broad, various, work routine, but includes only the physical exertion in "peeling" cedar.

"Mr. Woods was employed at the time, and for a period of three years prior thereto, by J. R. Keaton, primarily as a donkey engine operator, but with about 20% of his time being spent at trimming, measuring or peeling fallen trees."

This resume by the board is supported by the record. Without unduly burdening this opinion with additional excerpts from it, suffice it to say that appellant categorized the operation of the donkey, trimming, and measuring procedures as not being hard. The record also includes the opinion that peeling poles, in and of itself, is a strenuous exertion. In view of this record, there is probative evidence removing the effort from the usual routine.

Can we refuse, then, as a matter of law, to give force to the evidence which will support a reasonable inference that appellant was required to put forth unusual exertion, when he attempted to remove the bark from the "toughest" tree he had ever peeled? Is it our prerogative to determine

that this attempt did not require twice the usual force in jerking and tugging at recalcitrant bark, and, in the absence of evidence, must we conclude, as a matter of law, that the work he usually performed was as burdensome?

To do so, we must close our eyes to nature's miracles, and to its freaks, and we must hold that nature cannot vary its contemporaries. May not reasonable people believe that the type of soil, amount of moisture, access to the sun, and health factors may provoke unseasonable dormancy, or create marked variability in the bark of cedar trees? If so, may it not be said that the precipitate attack was caused by unusual exertion made necessary by a natural phenomenon.

The testimony seems to offer room for a reasonable difference of opinion, and we, therefore, conclude that appellant made out a prima facie case of causal relationship between his unusual exertion and his injury, and the case should have been permitted to go to the jury. *Towne v. Department of Labor & Industries, supra; Abbott v. Department of Labor & Industries, supra.*

The judgment of dismissal is, therefore, reversed, and the case is remanded for trial.

OTT, C. J., FINLEY, HAMILTON, and HALE, JJ., concur.