[No. 1311-2.    Division Two.    February 26, 1976.]

ROBERTA L. LOUDERBACK, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, ET AL, *Respondents*.

*Richard E. Goodwin* (of *Ingram, Zelasko & Goodwin*), for appellant.

*Slade Gorton, Attorney General, Kirk I. Mortensen, Assistant,* and *Calhoun Dickinson* (of *Perkins, Coie, Stone, Olsen & Williams*), for respondents.

PETRIE, C.J.—Chester Louderback collapsed and died at work on December 10, 1971. His widow filed a claim with the Department of Labor and Industries for benefits payable under the workmen's compensation act. The department denied her claim, and the Board of Industrial Insurance Appeals affirmed the department's action. The

Superior Court for Grays Harbor County dismissed Mrs. Louderback's subsequent appeal on the ground that she failed to present substantial evidence to prove her husband sustained an injury in the course of his employment with ITT Rayonier, Inc.

Mrs. Louderback appealed to this court contending that her husband sustained a fatal injury on December 10 resulting from (1) physical strain when he ascended a steep stairway minutes before his death, and (2) emotional strain when he supervised reactivation of a boiler which started malfunctioning approximately 2 hours before his death. We hold there is insufficient evidence to support Mrs. Louderback's contention that her husband sustained an injury within the meaning of the workmen's compensation act solely from the physical strain exerted in climbing the stairway, but there is sufficient evidence which, if believed by a jury, could support her contention that Mr. Louderback sustained a fatal injury from the combination of the physical and emotional strains experienced during the 2 hours preceding his death.

The jury could find the following fact pattern: At the time of his death, Mr. Louderback was 57 years of age, 6 feet 4 inches tall, and weighed approximately 280 pounds. He worked for the same employer since 1941, and for the past 16 years had been an operating or "shift" engineer charged with supervising a crew of nine workmen in the operation of a large, 2-floor powerhouse which generates and distributes steam and electrical energy to service two large adjoining paper mills. During the course of a day's work Mr. Louderback walked throughout the powerhouse inspecting the equipment and, in particular, he regularly traversed the long flight of stairs between the two floors in the powerhouse.

Power is generated by six boilers, one of which is known as boiler No. 7, an oil-fired boiler with six burners which are automatically gas-ignited in sequence when proper conditions are met. Boiler No. 7 provides 60 to 75 percent of the steam for the mills. When boiler No. 7 ceases to func-

tion it is said to "trip-out." Relighting No. 7 boiler after a trip-out produces the most severe emergency situation the powerhouse crew encounters. On the average, a No. 7 trip-out occurs seven times a year. We are not told how frequently a No. 7 trip-out occurred during Mr. Louderback's shift or how many days or months elapsed since No. 7 last tripped out prior to December 10, 1971. One employee could not remember a previous No. 7 trip-out in November of 1971, but he estimated that a prior No. 7 trip-out did occur within 6 months of December 10.

When all the powerhouse equipment worked properly Mr. Louderback's routine duties did not require heavy physical labor. However, emergencies from malfunctioning of equipment occurred frequently, albeit intermittently and unpredictably. Mr. Louderback's entire crew was well trained to handle any potential emergency regardless of its severity.

Because of the drastic curtailment of power and possible shutdown of portions of the mills whenever boiler No. 7 went off the line, all the crew, including the operating engineer, were required to react quickly. During reactivation they functioned "at a high rate of pace" to minimize the steam loss. During that stage of the work, the atmosphere became "highly intense," anxiety became "quite high," and the operating supervisor was required to proceed with "more than ordinary exertion or tension."

During the morning hours of December 10, Mr. Louderback appeared to the firehouse fireman "to be in perfectly normal health as I knew him." Shortly after 11 a.m. the fireman observed the oil pressure gauge fluctuating violently on No. 7 boiler. He knew boiler No. 7 was tripping out and he so notified Mr. Louderback, who then "shut part of the mill down." The crew proceeded to perform their assigned duties to relight the boiler. Sometime thereafter the low-water alarm on No. 6 boiler also sounded, "which constituted another emergency." Mr. Louderback recognized the additional problem and, appearing normal at the time, waved off the fireman who had intended to perform

his assigned duty to respond to the No. 6 alarm by starting another feedwater pump on the floor below. Mr. Louderback descended the stairs, turned on the additional pump, and returned to the upper floor.

At the top of the stairs another workman saw Mr. Louderback stop and lean on a railing. He appeared to be "winded" and "taking deep breaths." The workman commented to one of Mr. Louderback's crew, "Chester looks like he doesn't feel too good." A brief period later, another workman saw Mr. Louderback "walking briskly" on the boiler deck on the top floor toward the turbine room. A telephone rang in the turbine room, Mr. Louderback entered, and the telephone ceased ringing. He reappeared near the door of the turbine room, "stopped and appeared to look as though he wanted to sit down and his head fell forward and he collapsed."

Mr. Louderback's attending physician, who had seen him professionally approximately 40 times since 1961, described him as follows: "He was a tense, over-anxious type individual, probably keeps things within himself. He's more or less kind of on the go all the time."

In April 1970, Mr. Louderback told his physician that he experienced tightness of his chest but no chest pains. He also complained of numbness in his arms and shoulder area and occasional "dizzy" spells. His physician did not believe the symptoms indicated a heart problem. Nevertheless, as a test he prescribed nitrate sublingually. There is no indication that Mr. Louderback ever used or even purchased any of this medication. On December 9, 1971, the day before Mr. Louderback's death, his physician administered a gamma globulin injection at Mr. Louderback's request because he believed he had been exposed to some form of hepatitis. At that time Mr. Louderback registered no complaint and his doctor noticed nothing unusual about him.

We consider, first, the statutory definition of an injury as defined in RCW 51.08.100:

"Injury" means a sudden and tangible *happening*, of a traumatic nature, *producing* an immediate or prompt *re-*

*sult,* and occurring from without, and such physical conditions as result therefrom.

(Italics ours.)

■ ■ In a so-called fatal "heart attack" case, the workman's widow (or other beneficiary) must present substantial evidence that her husband's death (*result*) was *produced* by a *happening* in the course of his employment. Proof of the happening requires substantial evidence that her husband's work activity which she contends precipitated death was (1) a matter of notoriety, an event which can be fixed in time, and (2) an unusually strenuous exertion, physical or emotional, a strain or exertion not ordinarily required of her husband in the performance of his duties. *Sutherland v. Department of Labor & Indus.,* 4 Wn. App. 333, 481 P.2d 453 (1971); *In re Taylor,* 69 Wn.2d 19, 416 P.2d 455 (1966); *Warner v. Department of Labor & Indus.,* 68 Wn.2d 607, 414 P.2d 628 (1966); *Higgins v. Department of Labor & Indus.,* 27 Wn.2d 816, 180 P.2d 559 (1947). A reasonable inference that the workman's activity achieved the requisite intensity will suffice to present the issue to a jury. *Woods v. Department of Labor & Indus.,* 62 Wn.2d 389, 382 P.2d 1014 (1963). However, exertion required in the normal routine duties of a job does not satisfy the prerequisite of a happening. *In re Taylor, supra.*

Proof of the "happening" is essentially a legal fact question, as opposed to a medical fact question, and is not dependent for its support upon an opinion by a *physician* that the workman's work activity was unusually strenuous in contrast to the work activity which he ordinarily performed. Nevertheless, the necessity for this judicially imposed limitation upon the definition of an injury in a "heart" case has been ascribed to "currently persuasive medical theory." *Boeing Co. v. Fine,* 65 Wn.2d 169, 396 P.2d 145 (1964).

Proof that the happening *produced* the result, on the other hand, requires a physician's opinion that the incident which occurred during employment, more likely than not, was a contributing factor to the death of the workman who

otherwise would have lived for an indefinite and unpredictable time. *Mork v. Department of Labor & Indus.*, 48 Wn.2d 74, 291 P.2d 650 (1955); *Petersen v. Department of Labor & Indus.*, 40 Wn.2d 635, 245 P.2d 1161 (1952).

In the case at bench, the unfortunate "result" was Mr. Louderback's death. The autopsy surgeon indicated that Mr. Louderback had severe coronary arteriosclerosis evidenced in part by a narrowing, but no occlusion, of the lumen of the coronary arteries, especially the anterior descending branch of the left coronary artery. Autopsy also revealed evidence of myocardial damage sustained in the past, manifested in part by microscopic evidence of tissue scarring as well as scattered mononuclear inflammatory cells. All physicians who testified indicated that neither the gross nor the microscopic findings of the autopsy surgeon directly established the medical cause of death, but all agreed that the probable, immediate cause was ventricular fibrillation, and that death occurred within a very brief period after fibrillation commenced. However, the physicians disagreed on the question of whether Mr. Louderback's work activity on December 10 caused or precipitated the fibrillation, primarily, it should be noted, because they held differing *medical* views as to the *intensity* of strain, physical or emotional, necessary to precipitate the death-causing conditions.

Two physicians believed Mr. Louderback experienced an episode of myocardial ischemia brought on because of the heart's increased demand for oxygen following exertion. Another eminently qualified physician expressed the opinion that Mr. Louderback died when he did because his coronary atherosclerosis progressed to the stage where it was no longer compatible with life, and that ventricular fibrillation results when the conductive system between the previously injured portion of the heart and the contiguous, normal portion of the heart develops a "short circuit." Despite the differences of opinion, there is substantial medical evidence in the record which, if believed by a jury, could support a conclusion that Mr. Louderback died when he did

because of his work activity on December 10, and that but for that work activity he would have lived for an indefinite and unpredictable time.

Accordingly, the real issue is whether that work activity constituted a "happening" within the statutory definition of an injury. Through the years, several attempts have been made to apply the subjective "intensity" test to given fact situations in order to measure, as a matter of law and despite the acknowledged sufficiency of the medical testimony, whether or not evidence of a workman's work activity at least minimally supports his claim for injury or his beneficiary's claim for death benefits. We will not attempt to analyze the various nuances and factual distinctions, fancied or otherwise, which have apparently been considered controlling in individual cases.[1] We are required, however, to apply this intensity test to the evidence which we have summarized in a light most favorable to the widow's claim. *Johnson v. Department of Labor & Indus.*, 46 Wn.2d 463, 281 P.2d 994 (1955).

If Mr. Louderback's ascent of the steep stairway was the only significant stress factor, we would be obliged to hold as a matter of law that that act, performed regularly and routinely several times a day during a normal day's activity, did not satisfy the minimal proof that a happening occurred. We are, however, presented with a fact pattern in

---

[1] *See* cases collected and analyzed in *Digest of Leading Washington Cases on Workmen's Compensation Law*, 102 *et seq.* (Supp. 1972). History appears to have proved the wisdom of Justice Steinerts' prophetic concern, when he authored the majority opinion in *McCormick Lumber Co. v. Department of Labor & Indus.*, 7 Wn.2d 40, 59, 108 P.2d 807 (1941) (subsequently overruled by *Windust v. Department of Labor & Indus.*, 52 Wn.2d 33, 323 P.2d 241 (1958)):

> To say now that some unusual effort or strain is necessary to render death compensable, would not only be in direct conflict with the plain and emphatic language of our holdings, but would also *introduce an element of uncertainty and confusion*, in that *every case would present a problem as to the standard to be used in determining whether or not, in a given instance, the exertion was unusual*, and whether or not the workman was expending only the ordinary exertion required in a particular line of employment.

(Italics ours.)

which a "tense, over-anxious" workman was confronted with a relatively infrequent, major emergency, upon which was superimposed an additional but less stringent emergency, of sufficient magnitude to require partial closure of the mills. Mr. Louderback traversed the stairway under this "highly intense" atmosphere while operations at the mills remained curtailed because of the limited power supply. We cannot say that he routinely and regularly performed that act under those circumstances. The combination of physical strain and emotional stress does not appear to us as a matter of law to be insufficient to support a jury determination that a happening occurred which produced his death. We find there is substantial evidence in the record to submit to a jury the issue of whether or not Mr. Louderback sustained a fatal injury on December 10, 1971, in the course of his employment.

Accordingly, we reverse the judgment of dismissal and remand this matter to the superior court with direction to proceed to trial.

PEARSON and REED, JJ., concur.