# NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| RONALD CORDOVA, DEC'D, | ) | No. 82845-2-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF RETIREMENT | ) | PUBLISHED OPINION |
| SYSTEMS, DEPARTMENT OF | ) | |
| LABOR & INDUSTRIES OF THE | ) | |
| STATE OF WASHINGTON, and | ) | |
| CITY OF SEATTLE, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

VERELLEN, J. — The special death benefit statute, RCW 41.26.048, permits a surviving spouse to recover a one-time duty-related death benefit if the surviving spouse can show that the decedent suffered an industrial injury. RCW 51.08.100 defines "industrial injury" as "a sudden and tangible happening of a traumatic nature producing an immediate or prompt result and occurring from without, and such physical conditions as a result therefrom." But where the decedent has been suffering from a long-term medical condition, medical testimony must establish that a specific identifiable event caused the unusual exertion resulting in the decedent's condition.

Here, Seattle Police Department Detective Ronald Cordova died of a stroke 10 days after being assigned as the primary detective in a complex officer-involved shooting investigation. Because the evidence did not establish that a single

No. 82845-2-I/2

identifiable event caused Detective Cordova to experience unusual physical or emotional exertion resulting in his stroke, the Board of Industrial Insurance Appeals did not err in concluding that Detective Cordova did not sustain an industrial injury within the meaning of RCW 51.08.100.

Therefore, we affirm.

FACTS

In 2015, Ronald Cordova,[1] a Seattle Police Department (SPD) detective, joined SPD's Force Investigation Team (FIT).

SPD's FIT is made up of a group of SPD detectives who investigate serious "use of force" incidents including officer-involved shootings, in-custody deaths, and officer misconduct related to force. During FIT investigations, FIT detectives have unpredictable schedules, mandatory standby shifts, and after hours on call responsibility on a rotating basis.

On April 20, 2017, an officer-involved shooting occurred near the Federal Building in downtown Seattle. Three SPD officers were shot, and a suspect was killed during the incident. Approximately 400 officers responded to the incident. SPD's FIT was put in charge of the complex investigation. After the scene was "secured and safe," the FIT began their investigation.

That same day, SPD Sargent George Davisson assigned Ronald to be the primary investigator. Ronald had not previously led a FIT investigation involving

_____

[1] Because Ronald, Tracy, and Zachary Cordova share the same last name, we refer to them by their first names for clarity.

2

an officer-involved shooting but due to the "rotational schedule" of the FIT, Ronald knew that he was scheduled to be the primary detective on the next investigation.

On April 30, 2017, Ronald was on standby shift.[2] That morning, Ronald watched a movie with his son, Zachary Cordova. At approximately 11:40 a.m., Tracy Cordova, Ronald's wife, saw him sitting in a chair using his iPad and watching TV. Tracy left to run an errand.

At approximately 2:45 p.m., Tracy returned from her errand and went upstairs with Zachary to ask Ronald for help unloading the car. Tracy and Zachary found Ronald dead, lying in the bed, with his iPad on his chest.

That May, Tracy filed an application with the Department of Retirement Systems for a one-time duty-related death benefit through the Law Enforcement Officers' and Fire Fighters' program. The Department of Labor and Industries (Department) denied Tracy's claim. Tracy filed a motion for reconsideration, which the Department denied. Tracy appealed to the Board of Industrial Insurance Appeals (Board).

At the hearing, Ronald's family, colleagues, and medical experts testified that over the 10-day period before Ronald's death, he was experiencing a heightened level of stress, and the experts all agreed that his cause of death was a rupture of a berry aneurysm, which caused a subarachnoid hemorrhage, a form

---

[2] A FIT detective on standby shift is required to respond to emergencies within 15 minutes of being contacted. The standby ordinance allows a detective to engage in off-duty activities as long as the officer complies with the required response time. SMC 4.21.010.

3

of stroke.[3]  The experts also noted that Ronald was overweight and had chronic hypertension.

The Board determined that Ronald did not sustain an industrial injury under RCW 51.08.100 and that his stroke did not qualify as an occupational disease under RCW 51.08.140.  The Board affirmed the Department's decision.

On July 20, 2020, Tracy appealed the Board's decision to the Snohomish County Superior Court.  In April, the Department moved for summary judgment. The trial court granted the Department's summary judgment motion and affirmed the Board's decision.

Tracy appeals.

ANALYSIS

I.  One-Time Duty-Related Death Benefit

Tracy argues the trial court erred in granting the Department's motion for summary judgment because there were genuine issues of material fact whether Ronald suffered an industrial injury under RCW 51.08.100 sufficient to proceed to a jury.

We review a trial court's grant of summary judgment de novo, engaging in the same inquiry as the trial court.[4]  "Summary judgment is proper as a matter of

---

[3] "A berry aneurysm refers to an abnormality of the blood vessels of the brain that can either be a congenital or an acquired abnormality.  And the specific abnormality is an outpouching of the wall of the blood vessel and artery, not a vein, that is a weakening of the wall that allows a little ballooning of the wall to occur.  And that is a classic berry aneurysm."  Certified Appeals Board Record (CABR) at 1003.

[4] Hill v. Dep't of Labor & Indus., 161 Wn. App. 286, 292, 253 P.3d 430 (2011).

4

No. 82845-2-I/5

law when no genuine issue exists as to any material fact."[5] We review all facts

and inferences from those facts in the light most favorable to the nonmoving

party.[6]

When reviewing the Board's decision, we rely exclusively on the certified

appeals board record.[7] "The [Board's] findings and decision are prima facie

correct and the worker challenging the [Board's] decision has the burden of

proof."[8]

RCW 41.26.048, the special death benefit statute, provides,

(1) A two hundred and fourteen thousand dollar death benefit shall
be paid to the member's estate, or such person or persons, trust
or organization as the member shall have nominated by written
designation duly executed and filed with the department. If there
be no such designated person or persons still living at the time of
the member's death, such member's death benefit shall be paid
to the member's surviving spouse or domestic partner as if in fact
such spouse or domestic partner had been nominated by written
designation, or if there be no such surviving spouse or domestic
partner, then to such member's legal representatives.

(2) The benefit under this section shall be paid only when death
occurs: (a) As a result of <u>injuries sustained in the course of
employment</u>; or (b) or as a result of an occupational disease or
infection that arises naturally and proximately out of employment
covered under this chapter. The determination of eligibility for the
benefit shall be made consistent with Title 51 RCW by the
department of labor and industries. The department of labor and

---

[5] <u>Rabey v. Dep't of Labor & Indus.</u>, 101 Wn. App. 390, 394, 3 P.3d 217 (2000).

[6] <u>Romo v. Dep't of Labor & Indus.</u>, 92 Wn. App. 348, 354, 962 P.2d 844 (1998).

[7] <u>Watson v. Dep't of Labor & Indus.</u>, 133 Wn. App. 903, 909, 138 P.3d 177 (2006).

[8] <u>Id.</u>

5

industries shall notify the department of retirement systems by order under RCW 51.52.050.[9]

RCW 51.08.100 defines "injury" as "a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom."

Under section .100, the injury must be concrete, identifiable, and based upon a specific event or a specific happening.[10] The injury cannot be based on multiple exposures or multiple traumas occurring over a period of time.[11]

Washington law does not clearly mandate "a certain temporal duration" to establish an "immediate or prompt result."[12] But the causal condition must be

---

[9] RCW 41.26.048 (emphasis added). Tracy does not argue that Ronald suffered from an occupational disease as a result of his employment.

[10] Rothwell v. Nine Mile Falls Sch. Dist., 149 Wn. App. 771, 781, 206 P.3d 347 (2009); Spino v. Dep't of Labor & Indus., 1 Wn. App. 730, 733, 463 P.2d 256 (1969).

[11] Windust v. Dep't of Labor & Indus., 52 Wn.2d 33, 39, 323 P.2d 241 (1958).

[12] Garrett Freightlines v. Dep't of Labor & Indus., 45 Wn. App. 335, 342, 725 P.2d 463 (1986); see also Haerling v. Dep't of Labor & Indus., 49 Wn.2d 403, 405, 301 P.2d 1078 (1956) ("The cumulative effect of long continued routine and customary duties upon a workman, regardless of the hours devoted thereto, is not a sudden and tangible happening. The statute contemplates a happening, of a traumatic nature, producing an immediate and prompt result in order for the injury resulting therefrom to be compensable under the act. A cumulative effect, however injurious, is noncompensable unless it constitutes an industrial disease, not here in issue."); Lehtinen v. Weyerhaeuser Co., 63 Wn.2d 456, 460, 387 P.2d 760 (1963) ("It is accepted that a constituent part of [the] definition includes the condition that the happening must have produced an immediate or prompt result. Although this court has had no occasion to circumscribe meaning in a case of this nature[,] nevertheless[,] a prime test is that of causal relationship between a physical condition and a happening."); Cooper v. Dep't of Labor & Indus., 49 Wn.2d 826, 828, 307 P.2d 272 (1957) ("a protracted series of incidents [does] not satisfy the requirement of the statute that an injury be a 'sudden and tangible

6

No. 82845-2-I/7

established by medical testimony.[13]  Specifically, for cerebral vascular accidents or strokes to qualify as an industrial injury, the "medical testimony [must show] the worker suffered from a long-term medical condition . . . caused by an 'unusual exertion' 'necessary to place the injurious result within the ambit' of a 'sudden and tangible happening, of a traumatic nature' required by RCW 51.08.100."[14]

Unusual exertion requires more than "ordinary exertion" but can be either physical or emotional.[15]  And a single event must cause the unusual exertion.[16]  But the time it takes for the medical condition to manifest is irrelevant if there is a specific identifiable event from which the injury occurred and medical testimony establishes that the specific identifiable event which gave rise to the unusual exertion caused the injury.[17]

---

happening, of a traumatic nature, producing an immediate or prompt result."') (quoting RCW 51.08.100).

[13] Garrett Freightlines, 45 Wn. App. at 342 (quoting Bennett v. Dep't of Labor & Indus., 95 Wn.2d 531, 533, 627 P.2d 104 (1981)).

[14] Spino, 1 Wn. App. at 735-36 ("In this case . . . the workman suffered from a long-term disease, a progressive hardening of the arteries or arteriosclerosis, unrelated to the particular employment hazard to which the workman was subjected.  It was necessary to apply the 'unusual exertion rule' . . . to determine whether the stroke suffered during accustomed exertion of employment was more than happenstance as to the time and place.").

[15] Sutherland v. Dep't of Labor & Indus., 4 Wn. App. 333, 335, 481 P.2d 453 (1971) (the appellate court held that "unusual emotional stress or strain may be a 'sudden and tangible happening of a traumatic nature' within the meaning of the statute.").

[16] Id.

[17] Garrett Freightlines, 45 Wn. App. at 342 (the court noted that "[t]he key is not in the establishment of a duration or time frame . . . but in the establishment of causation, the connection between the physical condition, and employment.  This causal condition must be established by medical testimony.  It is not always necessary, however, to prove every element of such causation by medical

7

The two key questions presented here are whether Ronald experienced a single event that gave rise to the unusual stressful exertion he experienced during the FIT investigation and whether medical testimony established that the single event characterized as an unusual stressful exertion caused the rupture of his berry aneurysm.

In Sutherland v. Department of Labor and Industries,[18] Sutherland, a business representative, spent four months negotiating for a contract.[19]  During a meeting with union members, the members unexpectedly rejected the proposed contract and proceeded "to tear" up the agreement over the next three hours.[20] After leaving the meeting, Sutherland suffered from a myocardial infraction in the parking lot and died.[21]  The appellate court held that the unusual emotional stress or strain the business representative experienced during the meeting was a sudden and traumatic happening within the meaning of the statute.[22]

In Rothwell v. Nine Mile Falls School District,[23] Rothwell, a custodian, was unexpectedly tasked with cleaning up the inside of a school where a student had

---

testimony.  If, from the facts and circumstances and medical testimony given, a reasonable person can infer that the causal connection exists, the evidence is sufficient.") (quoting Bennett, 95 Wn.2d. at 533).

[18] 4 Wn. App. 333, 481 P.2d 453 (1971).

[19] Id. at 336.

[20] Id.

[21] Id. at 337.

[22] Id. at 336-37.

[23] 149 Wn. App. 771, 206 P.3d 347 (2009).

committed suicide.[24]  Rothwell was asked to "go through the classrooms where [the student] had attended class earlier that day to determine whether he had left any bombs" and "clean and dump everything at the scene, which included needles, plastic gloves, brain matter, bone bits, and blood."[25]  The appellate court held that Rothwell's posttraumatic stress disorder did not result from a "single traumatic event; rather, it resulted from a series of incidents over a period of a few days."[26]  The court reasoned that "the emotionally traumatic experiences suffered by Ms. Rothwell after the suicide did not occur suddenly or have an immediate result.[27]

This case is more like Rothwell and less like Sutherland.  Similar to the business representative in Sutherland and the custodian in Rothwell, Ronald experienced unusual emotional stress or strain during the FIT investigation.  But like the custodian in Rothwell, Ronald did not experience a single identifiable event that could be characterized as unusual emotional exertion resulting in the rupture of his berry aneurysm.

Specifically, there was ample testimony regarding Ronald's stress, but no single identifiable event.  Tracy testified that "[i]n the last ten days [of his life, Ronald] was there when he could be, but not there."[28]  She stated that she could

---

[24] Id. at 774.

[25] Id. at 775-76.

[26] Id. at 782.

[27] Id. at 781.

[28] CABR at 734.

9

hear it in his voice and "see on his face how stressed he was. The lines on his forehead were deeper. The dark circles under his eyes. He was very, very stressed."[29]

Zachary testified that Ronald "was always very positive and outgoing" but noted that "[a]fter the ten days, he wasn't like that. I could tell there was strain on his face. There were wrinkles in his forehead."[30]

Ronald's colleagues also noted that during the 10-day period before he died, Ronald appeared exhausted, had little free time, was behind on his investigation notes, and was working during his days off and on weekends.

Further, the medical testimony presented here does not establish that a single identifiable event characterized as unusual emotional exertion caused the rupture of his berry aneurysm.

Doctor Ronald Early, a licensed physician, testified that Ronald was exhibiting an "exceptionally high level of stress at the time the cerebrovascular accident" that caused his death.[31] He also testified that "each individual task [Ronald] was assigned during that period of time would not be extraordinary. But when all of them that he experienced . . . were occurring at the same time, that required an extraordinary amount of energy and effort."[32] And Dr. Early did not identify any single identifiable event that caused the rupture of his berry aneurysm.

---

[29] CABR at 34.

[30] CABR at 750.

[31] CABR at 799-800.

[32] CABR at 824.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82845-2-I/11

Doctor Richard Wohns, a licensed neurosurgeon, testified that Ronald died at home in bed on his day off, and from his review of the evidence, he opined that Ronald did not experience any unusual exertion at that time.

Doctor Malveeka Sharma, a licensed neurologist specializing in vascular neurology, testified that overall stress can contribute to strokes, "but it's never the sole factor that's going to lead to a stroke."[33] Dr. Sharma opined that the work Ronald was doing at the time of his death did not cause his stroke. Dr. Sharma stated, "I think it was probably an accumulation of risk factors over time that led to the formation of his aneurysm, and the single event that caused the rupture of his aneurysm I can't say with any sort of confidence what could have caused that. It could have happened at any point in his life."[34] She testified that there was nothing unusual in the investigation that she believed would have caused his stroke.

And Doctor Rebecca Fischer, a licensed psychiatrist, testified that although Ronald was under a lot of stress and had a "high workload, he was actually functioning at a high level, and sort of going above and beyond the call of duty."[35]

The above testimony demonstrates that there is no evidence that a single identifiable event during the 10-day period at issue can be characterized as an unusual exertion "within the ambit of a 'sudden and tangible happening, of a traumatic nature'" required to establish an industrial injury under RCW

---

[33] CABR at 1052.

[34] CABR at 1053.

[35] CABR at 1097.

11

51.08.100.[36] Ronald did not suffer an industrial injury within the meaning of the statute.

Tracy argues that, taken together, all the events that took place in the 10-day period before Ronald's stroke can qualify as a single identifiable event under the Board's decision in In re David T.D. Erickson.[37] Erickson, a physician's assistant, was repeatedly harassed by a mentally ill coworker for three weeks.[38] The clinic "thoroughly investigated" Erickson's coworkers allegations against him as they "accelerated and intensified."[39] Specifically, Erickson's coworker alleged that "he had bungled the treatment of a gunshot wound victim, thereby causing the victim's death; that he had taken indecent sexual liberties with young females during the course of sports physicals; and that he had tried to poison her."[40] On the last day of the three-week period, Erickson committed suicide.[41] The Board held that the emotional trauma "sustained over a specific three-week period of time . . . by the decedent qualifie[d] as 'a sudden and tangible happening' within the purview of RCW 51.08.100, and that [Erickson's] resulting mental condition constituted an 'injury' under the Act."[42]

---

[36] Spino, 1 Wn. App. at 735-36.

[37] No. 65,990, 1985 WL 57345 (Wash. Bd. Indus. Ins. App. July 15, 1985).

[38] Id. at *1-2.

[39] Id. at *2.

[40] Id. at *6.

[41] Id. at *4-5.

[42] Id. at *4.

But the Board in <u>Erickson</u> did not characterize Erickson's "mental condition" as a long-term medical condition.[43]  And the outcome here specifically turns on the statutory construction of the meaning of an "industrial injury" under RCW 51.08.100 in the context of a long-term medical condition.  "Although this court gives deference to the interpretation of the agency charged with implementing the statute, the agency's interpretation is not binding."[44]  Because the context of the sudden and tangible happening here is different from the context of the sudden and tangible happening at issue in <u>Erickson</u>, we need not defer to the Board's decision.

In a related argument, Tracy contends that the medical testimony created a genuine issue of material fact as to whether the "unusual exertion and strain at the time of [Ronald's] death [was] caused by his work."[45]  As discussed, medical experts testified that Ronald's stroke was probably a result of "all [the tasks] he experienced," over a period of "10 days prior if not longer," and ultimately was the result of an "accumulation of risk factors."[46]  There was no single event here that could be characterized as unusual exertion.  Therefore, whether there could be a genuine issue of material fact as to traditional notions of proximate cause is not germane.  Tracy's argument is inapposite.

---

[43] <u>Id.</u>

[44] <u>Dep't of Labor & Indus. v. Briseno</u>, 12 Wn. App. 2d 406, 414, 457 P.3d 1250 (2020).

[45] Appellant's Br. at 29.

[46] CABR at 824, 1020, 1053.

13

II.  Attorney Fees

Tracy argues that she is entitled to attorney fees at trial and on appeal under RCW 51.52.130.  RCW 51.52.130 provides attorney fees to the prevailing party if the court finds that the Board's decision must be modified or reversed.  But because Tracy is not the prevailing party and we agree with the Board's decision, she is not entitled to attorney fees at trial or on appeal under RCW 51.52.130.

Therefore, we affirm.

_____

WE CONCUR:

_____  _____
Dwyer, J.                Andrus, C.J.

14